**In re LIMITED GAMING OF AMERICA, INC., Debtor.**

**In re Sunrise Island, Ltd., Debtor.**

**Bankruptcy Nos. 96–00395–M, 96–00396–M.**

United States Bankruptcy Court, N.D. Oklahoma.

Dec. 18, 1998.

Patrick O'Connor, Tulsa, OK, for Debtor.

**MEMORANDUM OPINION REGARDING CONFIRMATION OF PLANS OF REORGANIZATION SUBMITTED BY LIMITED GAMING OF AMERICA, INC.**

TERRENCE L. MICHAEL, Bankruptcy Judge.

THIS MATTER comes before the Court for consideration of confirmation of the Third Amended Plan of Reorganization (the "Third Amended Plan") filed in each of these Chapter 11 bankruptcy cases by Limited Gaming of America, Inc. ("LGA"), one of the Debtors herein. A preliminary hearing on confirmation was held on July 22, 1998, and an evidentiary hearing was held on August 28, 1998. At the conclusion of the August 28, 1998, evidentiary hearing, the Court took the matter under advisement. The following constitutes the Court's findings of fact and conclusions of law as required by Bankruptcy Rule 7052.

### Jurisdiction

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b),[1] and venue is proper pursuant to 28 U.S.C. § 1409. Reference to the Court of this matter is proper pursuant to 28 U.S.C. § 157(a). This is a core proceeding as contemplated by 28 U.S.C. § 157(b)(2)(L).

### Findings of Fact

LGA is a Colorado corporation originally formed on May 5, 1991. At the time LGA was formed, Carwin R. Bleidt ("Carwin") was its majority shareholder, holding about 94% of the outstanding stock. Bernie Koerner, Connie Koerner, Dudley Howden and Robert Lawson each owned various amounts of the remaining stock. As its name implies, the stated corporate purpose of LGA was to acquire real property in Colorado for the purpose of casino development. LGA is a "C" Corporation for federal income tax purposes.

Shortly after its creation, Robert Lobato ("Lobato") began working to assist LGA in its development efforts. Under the arrangement between LGA, Lobato and Carwin, Lobato was to receive 50% of any profits earned by LGA in its development activities.[2] As a result of a real estate transaction involving the sale of a tract of land in a Colorado gaming district in March of 1992, LGA realized a profit of approximately $7,000,000.00. Carwin failed to pay the agreed percentage

---

1. Unless otherwise noted, all statutory references are to sections of the United States Bankruptcy Code, 11 U.S.C. § 101 *et. seq.* (West 1998).

2. The exact nature of the arrangement between LGA, Lobato and Carwin was not made clear to the Court.

of the profits to Lobato. Lobato sued Carwin Bleidt in federal court in Colorado (the "Colorado Litigation") for his share of the profits. In April of 1994, a jury in Colorado awarded Lobato a judgment of $3,400,000.00 against Carwin, and awarded LGA a judgment of $78,557.00 against Lobato.

Carwin took certain actions with respect to his ownership interests in LGA in apparent response to the Colorado Litigation. In September of 1993, LGA moved its corporate offices to Seabreeze Boulevard in Daytona Beach, Florida. Thereafter, in December of 1993, Carwin transferred more than half of his LGA stock for no consideration to his wife, Carolyn Lobato–Bleidt ("Carolyn"), who, not coincidentally, is the sister of Lobato.[3] In April of 1994, Carwin pledged all of his remaining shares to LGA to secure loans allegedly previously made to him. Subsequently, in October of 1994, LGA issued an additional 121 million shares of stock with an issue price of $0.001 each. This action was taken without shareholder approval. Carwin declined to purchase any of the newly issued shares. Carolyn, however, acquired 97 million shares of the newly issued LGA stock. Shortly after the judgments were entered in the Colorado Litigation, Carwin resigned as president of LGA and was replaced by Carolyn.

*Purchase of Sunrise Island and Formation of Sunrise Island Timber Company*

In July of 1993, LGA entered into an option to purchase Sunrise Island, an island located in the Mississippi River north of Memphis, Tennessee "for the purpose of exploring a timber operation." *Trustee's Ex-hibit 2.* Sunrise Island is a heavily wooded island spanning 3,232 acres making it an ideal candidate for logging operations and hunting. Ultimately LGA hoped to develop Sunrise Island into a recreational complex including a casino. On September 9, 1993, LGA exercised its option and acquired Sunrise Island for a purchase price of $1,425,-000.00 in cash.

The purchase of Sunrise Island was not structured as a simple acquisition of the island by LGA. According to Carolyn, LGA decided to place Sunrise Island into a partnership in order to avoid negative tax consequences. *See Trustee's Exhibit 21, at p. 27.*[4] Carolyn testified that LGA's status as a "C" corporation for federal income tax purposes would subject LGA and its shareholders to "double taxation." If and when LGA sold an asset for a profit and paid its shareholders a dividend as a result, that profit would be taxed twice, once as a corporate profit and once as dividend income to the shareholder receiving the dividend. A partnership would not face this problem; distributions from a partnership would only be taxed once, when the partners are taxed on their profits.

Sunrise Island Timber Company ("Sunrise") officially came into existence on January 8, 1994, as a Florida partnership. Carolyn held the majority partnership interest in Sunrise. All of the partners of Sunrise were either related to or were themselves directors, officers, shareholders or employees of LGA.[5] LGA and Sunrise did not have separate offices and to a large extent had the same employees. *See Trustee's Exhibit 21, at p. 71.* Additionally, Oak Place Develop-

---

3. Carwin Bleidt owned 94.2% of the LGA stock, equaling 11 million shares. He transferred 5,500,001 shares to Carolyn Lobato–Bleidt.

4. The fact that the decision to transfer Sunrise Island from LGA to a partnership was made while the Colorado Litigation was pending is not lost on the Court.

5. *Partners in Sunrise at its Inception:*

| Name | Share in % |
|---|---|
| Carolyn Lobato–Bleidt* | 50.5 |
| Theresa B. Bleidt▲ | 4 |
| Carla M. Bleidt* | 2 |
| Aaron B. Bleidt▲ | 2 |
| Hodge L. Bleidt▲ | 2 |
| Bernie Koerner* | 10.5 |
| Connie Koerner*▲ | 10.5 |
| Jason B. Koerner▲ | 2 |
| Kathy Koerner▲ | 2 |
| Frederick J. Burmont* | 5 |
| Thomas E. Stanley* | 4 |
| Sharon Stanley▲ | 1 |
| Robert Lawson* | 2.5 |
| Dudley Howden* | 1 |
| Bob E. Brannon* | 1 |

*—denotes officer, director, shareholder or employee of LGA.

▲—denotes relative of officer, director, shareholder or employee of LGA.

*See Abraham Exhibit No. 15, p. 7.*

ment Company ("Oak Place"), a corporation largely owned and controlled by Carolyn, used some of the same employees as LGA and Sunrise. Carolyn confirmed that in any given day the employees at LGA's Seabreeze offices in Daytona Beach, Florida would do work for Sunrise, LGA and Oak Place. *See id.* None of the partners of Sunrise contributed major funds to Sunrise at its formation.[6] *See id.* at p. 28. LGA was the only source of funds for Sunrise and provided about $30,000.00 as an advancement of working capital in September of 1993.

On September 25, 1993, at a time before the documentation necessary to create Sunrise had been completed,[7] LGA sold Sunrise Island to Sunrise for the price of $1,522,500.00, plus $20,000.00 in sale expenses to the "expected to be formed partnership." Sunrise later effected the sale by executing a promissory note (the "Sunrise Note") and deed of trust in favor of LGA. Even though Sunrise did not officially come into existence until January 8, 1994, the Sunrise Note and deed effected by Sunrise were dated as of September 9, 1993. The Sunrise Note called for twenty-nine (29) consecutive semiannual installment payments of $94,325.00 and a final payment of all remaining principal and interest as payment number thirty (30). The first installment payment was due on March 9, 1994, and on every 9th day of September and March thereafter, concluding with the 30th payment on September 9, 2008. Interest was to accrue on the Sunrise Note at the rate of ten per cent (10%) per annum.

LGA and Sunrise also executed a management agreement as of September 9, 1993. Pursuant to that agreement, LGA was to "manage" Sunrise Island, and receive a $10,000.00 monthly management fee in return.

The management agreement provided some legitimate function and revenues for LGA, which had no real business of its own at the time. *See Trustee's Exhibit 21,* p. 32. The management agreement functioned for tax purposes to avoid a classification of LGA as a mere holding company which could have exposed it to taxation on any of its undistributed assets. *Id.* at pp. 32–33. Bob Brannon, a minor partner in Sunrise (1% partnership interest), worked as a consultant overseeing the cutting of timber and various other projects on the Island. *See Trustee's Exhibit 23,* at p. 25. He was paid a fee of $4,000.00 per month by Sunrise. *Id.* Sunrise became a Florida limited partnership in February of 1995, and was renamed Sunrise Island, Ltd. Carolyn became the managing general partner of Sunrise in its new form as a limited partnership.

In early 1994, Sunrise sold timber from Sunrise Island to P.E. Barnes for $1,000,000.00 in cash. After Sunrise deposited these funds into its account on April 7, 1994, it issued a check to LGA in the amount of $95,674.08 as a semi-annual payment on the Promissory Note. No other payments have been made on the Promissory Note. Sunrise also paid an additional $40,000.00 to LGA, of which $30,000.00 constituted a repayment of working capital advanced by LGA to Sunrise, and $10,000.00 constituted the agreed on monthly management fee. LGA has not received any other management fee payments from Sunrise. Approximately $500,000.00 of the monies from the timber sale were disbursed to the partners of Sunrise. Carolyn testified that she made the decision to distribute these sums to the partners due to the pressure they exerted upon her to make some distribution.[8] *See Trustee's Exhibit 21,*

---

**6.** Carolyn testified in her June 2, 1997, deposition that the initial total amount contributed by the partners of Sunrise probably did not exceed $1,000.00. *See Trustee's Exhibit 21,* at p. 28.

**7.** According to Carolyn, Sunrise was formed on a *de facto* basis in September of 1993. *See Trustee's Exhibit 21,* at pp. 13, 19.

**8.** Distributions were as follows:

| Partner | Dollar Amount ($) |
| --- | --- |
| Carolyn Lobato–Bleidt | 252,500.00 |
| Thomas E. Stanley | 20,000.00 |
| Frederick J. Burmont | 25,000.00 |
| Sharon J. Stanley | 5,000.00 |
| Theresa V. Bleidt | 20,000.00 |
| Robert W. Lawson | 12,500.00 |
| Carla M. Bleidt | 10,000.00 |
| Hodge Lester Bleidt | 10,000.00 |
| Aaron C. Bleidt | 10,000.00 |
| Dudley Howden | 5,000.00 |
| Bob E. Brannon, Sr. | 5,000.00 |
| Connie Koerner | 52,500.00 |
| Jason Koerner | 10,000.00 |
| Kathy S. Koerner | 10,000.00 |

at p. 45 ("There was almost a revolt. They wanted some distribution.").

In September of 1994, after Robert Lobato had received the judgment in the Colorado Litigation, and after it became apparent that Sunrise would be unable to make its mortgage payment to LGA, Sunrise and LGA began to consider conversion of the debt owed to LGA to an interest of LGA in the partnership. *See Trustee's Exhibit 21* at pp. 52, 55. LGA also had the option to foreclose its mortgage. *See id.* at p. 64. According to Carolyn, if LGA reacquired Sunrise Island through foreclosure, the Island could have been subjected to a federal tax lien. *See id.* at 65. Instead, Sunrise and LGA agreed to convert $1,000,000.00 of the debt owed to LGA to a one-third interest in Sunrise; the remaining outstanding balance of principal and interest of approximately $654,000.00 was secured by a replacement promissory note and first deed of trust in favor of LGA. No payments on the note were due until seven (7) years from the date the note was signed. According to Carolyn, no written agreements regarding the replacement note and the debt for equity swap were executed until early 1995, due to tax considerations. *See Trustee's Exhibit 21* at p. 58.

Thomas Potts, a partner in the law firm James, Potts & Wulfers ("Potts"), testified as an expert as to the validity of the formation of Sunrise as a vehicle to avoid or minimize tax liability. He based his testimony on the review of the deposition testimony of Carolyn, Bernie Koerner, Tom Stanley and Bob Brannon. Potts testified that the creation of Sunrise was merely a "tax-motivated sham,"[9] noting that Carolyn had testified that the formation of Sunrise was tax-motivated. He drew his conclusion that Sunrise was merely a "sham" from several factors:

1. He found the partnership to be completely undercapitalized at its outset with the partners making minimal, if any, contributions.[10]

2. The promissory note and deed of trust for the Sunrise Island property pre-dates by a substantial amount of time, i.e., approximately four (4) months, the formation of the partnership.

3. Substantial cash disbursements were made to the partners, i.e., $500,000.00 of the $1,000,000.00 received in the P.E. Barnes timber sale was distributed to the partners almost immediately after the sale.

4. The outstanding promissory note from Sunrise to LGA on the Sunrise Island property with a balance of $686,250.42 was held in a complete moratorium with regard to payment for seven (7) years. It is questionable if it was ever meant to be paid.

5. LGA gave up a $1,000,000.00 secured interest in the Sunrise Island property for a one third (1/3) ownership interest in the partnership.

6. LGA's only function was the management contract with Sunrise for the management of the Sunrise Island property. The Internal Revenue Service ("IRS") can impose a personal holding company liability for a corporation without a function and an actual accumulated earnings tax.

7. Mr. Brannon was paid about $4,000.00 per month to manage Sunrise Island, completely usurping the management function ascribed to LGA.

Potts testified that the IRS would likely use the "form over substance" doctrine to expose the "sham" between LGA and Sunrise and reallocate the income from Sunrise to LGA since LGA and Sunrise are *de facto* the same entity. He also testified that the *ab initio* consolidation of LGA and Sunrise would be consistent with the view the IRS would take with regard to LGA and Sunrise.

*The Transaction between LGA and Levie Mortgage*

One of LGA's assets was the income stream from a note on Carolyn's residence in Ormond Beach, Florida (the "Ormond Resi-

---

9. Potts defined a "sham" as a transaction or an entity that has no viable economic purpose other than tax evasion or avoidance.

10. He stated that his review of various documents and deposition testimony indicated to him that the partners contributed no more than $1,000.

dence"). The circumstances surrounding the acquisition of the Ormond Residence by Carolyn are significant. On the 15th day of April, 1994, LGA executed and delivered a warranty deed on the Ormond Residence to Carolyn. Carolyn executed the deed in her capacity as President of LGA. On that same day, Carolyn executed and delivered a promissory note (the "Ormond Note") in the sum of $342,000.00 to LGA. The Ormond Note provided for 360 monthly installments, and was secured by a first mortgage (the "Ormond Mortgage") on the Ormond Residence.[11]

On April 7, 1995, LGA assigned to Levie Mortgage Investment Corporation ("Levie") the Ormond Mortgage and a portion (135 payments) of the Ormond Note from Carolyn, pursuant to a partial purchase Agreement (the "Assignment"), in exchange for a cash payment of $190,000.00. The Assignment was without recourse to LGA. This transaction occurred in April of 1995, after the Receiver (see p. 11 infra) had been appointed and without his authorization. The funds received were placed into the accounts of Oak Place of which Carolyn was the main shareholder with an 82% interest. Thereafter, Levie assigned its interest in the Ormond Note, the Ormond Mortgage and the Assignment to Beneficial Savings Bank, F.S.B. ("Beneficial").[12]

*The Transaction between LGA and Goldman Sachs & Co.*

Sunrise Island was encumbered by a note held by LGA and secured by a Deed of Trust against the Sunrise Island property. According to Carolyn, in order to reduce its debt to LGA and generate some operating capital, Sunrise decided to take out a loan on the Island. See Trustee's Exhibit 21, at p. 65. On June 9, 1995, after lengthy negotiations between Carolyn and Goldman Sachs & Co., for the benefit of the Charles M. Ballard IRA ("Goldman Sachs"), LGA, through Carolyn, entered into a subordination agreement with Goldman Sachs which subordinated LGA's lien on Sunrise Island to Goldman Sachs' lien on Sunrise Island in exchange for a loan from Goldman Sachs to LGA in the amount of $500,000.00. Neither the other directors or shareholders, nor the court appointed Receiver of LGA agreed to said subordination.

The loan transaction between Goldman Sachs and LGA (through Carolyn) was closed on June 15, 1995. The loan proceeds in the amount of $472,589.56 were deposited in LGA's account by Sunrise on or about June 16, 1995. However, the majority of the loan proceeds (almost $300,000.00) ultimately flowed to Carolyn.

*Florida Fraudulent Transfer Litigation*

In April of 1994, Lobato recorded his $3,400,000.00 judgment obtained against Carwin in the Colorado Litigation in Volusia County, Florida. Lobato began pursuing a fraudulent transfer action in the state courts of Florida against Carwin and LGA seeking to avoid the December 1993 transfer of stocks from Carwin to Carolyn and the April 1994 stock pledge to LGA for outstanding loans. See Robert Lobato v. Carwin Bleidt and Limited Gaming of America, Inc., 94–31087–CI–31, Circuit Court in and for Volusia County, Florida (the "Florida Action"). In October of 1994, the Circuit Court of Volusia County entered its judgment holding that the 1993 transfer of shares from Carwin to Carolyn and the April 1994 pledge of stock to LGA to secure outstanding loans were fraudulent and void. The Court also ordered the fraudulently transferred shares to immediately be surrendered to the Sheriff of Volusia County Florida. Lobato purchased Carwin Bleidt's 11 million shares of stock at a December 5, 1994, Sheriff's sale in Volusia County.

Lobato did not learn of the October 1994 stock dilution (see p. 3 supra) until approxi-

---

**11.** Once again, all of these events occurred at about the same time Lobato obtained his judgment against Carwin in the Colorado Litigation.

**12.** At a December 8, 1998, hearing, counsel for Beneficial advised the Court that the Ormond Note, the Ormond Mortgage and the Assignment had been assigned once again. As of the writing of this memorandum opinion, the Court does not know the identity of the assignee. Counsel for Beneficial has advised the Court that the assignee is aware of these bankruptcy cases, and does not contest that the Court's order on confirmation is applicable to it.

mately December of 1994. The stock dilution placed Lobato in a minority position within LGA and diminished the value of his stock. In order to avoid further waste and dissipation of corporate assets, Lobato filed a motion with the Circuit Court of Volusia County to appoint a receiver. On January 10, 1995, Robert Abraham ("Abraham" or "Receiver") was appointed Receiver for LGA by the Circuit Court of Volusia County, Florida in the Florida Action. Charles D. Hood, Jr. ("Hood") served as attorney for the Receiver.

On June 28, 1995, the Volusia County Court held the stock transfers and issues by LGA fraudulent and void *ab initio*. It declared Lobato to be the rightful owner of any stocks previously owned by Carwin. The Court also held that the subordination of LGA's mortgage to Goldman Sachs was fraudulent.[13] The Court prohibited LGA from enforcing its judgment against Lobato. On September 21, 1995, the Circuit Court for the Seventh Judicial Circuit in and for Volusia County issued an order finding that the ownership of LGA assets was obtained fraudulently by Carolyn and Carwin, requiring them to turn over any and all LGA assets in their possession including any interest in Oak Place Development Corporation, the Ormond Residence and Sunrise Island.[14] The implementation of said order was delayed due to the Chapter 13 bankruptcy filing of Carolyn Lobato–Bleidt on September 21, 1995. The order was eventually executed in November of 1995, pursuant to a motion for relief from the automatic stay.[15] As a result of these orders, Lobato is LGA's current president and owns about 95% of LGA's stock.

*LGA and Sunrise Bankruptcies*

In early 1996, Goldman Sachs decided to foreclose its Deed of Trust on Sunrise Island. Consequently, a trustees' sale of Sunrise Island was scheduled for February 9, 1996. To avoid the sale of Sunrise Island, Lobato as the representative of both Sunrise and LGA, decided to seek the protection of the bankruptcy court and reorganize the businesses. Consequently, both of the above referenced Chapter 11 bankruptcy cases were filed concurrently [16] on February 7, 1996.

Upon a motion by Goldman Sachs, after an evidentiary hearing before this Court, Patrick Malloy, III ("Malloy") was appointed as the Chapter 11 Trustee of Sunrise in February of 1997. Malloy filed a motion to substantively consolidate the LGA and Sunrise Island cases. At that time, LGA opposed the motion and Abraham supported substantive consolidation. The motion was later withdrawn by Malloy.

After his appointment, Malloy undertook to sell Sunrise Island. His efforts met with success, and on or about March 16, 1998, he motioned the Court to allow the sale of Sunrise Island. The Court approved the sale, and Sunrise Island was sold for approximately $1,700,000.00. In early May of 1998, after some delays, the sale closed, and Sunrise received $1,677,707.94 in proceeds from the sale. LGA received $20,000.00 from said sale. Malloy waived his fees with regard to the sale of Sunrise Island, resulting in a significant benefit for the estate.

*Pending Adversaries*

In spite of the sale of Sunrise Island and the infusion of large amounts of money into the estates of LGA and Sunrise, litigation in the cases continues with unabated vigor.

*LGA v. Goldman Sachs*

On March 5, 1996, Sunrise instituted an adversary proceeding against Goldman Sachs seeking to subordinate the lien held by Goldman Sachs on Sunrise Island. This adversary was docketed as Adv.Proc. 96–0088–C. After being denied permission to intervene in this adversary proceeding, LGA instituted its own adversary proceeding against Goldman Sachs on May 1, 1996, claiming that the

---

13. Said order was appealed and affirmed and is now final.

14. Both the September 21, 1995, and the June 28, 1995, judgments were appealed and consequently affirmed and are now final judgments.

15. Carwin Bleidt filed a Chapter 7 bankruptcy petition in January of 1996. Shortly thereafter, he committed suicide.

16. Limited Gaming of America, Inc. filed its case on February 7, 1996 at 1:22 p.m., and Sunrise Island, Ltd. filed its case on February 7, 1996 at 1:27 p.m.

subordination of LGA's mortgage to Goldman Sachs mortgage was void. *See Limited Gaming of America Inc. v. Goldman Sachs & Co.*, Adv.Proc. 96–0156–C. These two adversary proceedings were consolidated by an order entered June 3, 1996. *See Docket No. 24*, Adv.Proc. 96–0088–C. On motion for summary judgment filed by LGA, this Court, per the Honorable Stephen J. Covey, ruled that the subordination of LGA's mortgage to Goldman Sachs' mortgage on the Sunrise Island property was void, and that LGA's mortgage takes priority over Goldman Sachs' mortgage. The remaining issue in this adversary proceeding is whether LGA's mortgage should be equitably subordinated to Goldman Sachs' mortgage. This issue would be mooted by confirmation of the Third Amended Plan.

*LGA v. Abraham, Hood, Levie and Beneficial*

LGA filed an adversary proceeding against Abraham, Hood, Levie and Beneficial on August 1, 1996, alleging negligence in Abraham's duties as Receiver and seeking in excess of $1,000,000.00 in damages. LGA also contests the validity of a mortgage by Abraham and Hood on the Ormond Beach residence in the sum of $66,000.00. In the same adversary proceeding, LGA also contests Levie's and Beneficial's mortgage on the Ormond Residence. Confirmation of the Third Amended Plan would not affect this adversary proceeding.

*LGA v. Doran, Walters, Rost, Selter & Wolfe, P.A.*

On January 16, 1998, LGA also brought an adversary proceeding against the Florida law firm of Doran, Walters, Rost, Selter & Wolfe, P.A. and the partners of said firm individually, *Limited Gaming of America, Inc. v. Doran, Walters, Rost, Selter & Wolfe, P.A.*, Adv.Proc. No. 98–0016–M, alleging that the firm and its partners committed legal malpractice, breach of fiduciary duty and conspiracy to defraud while representing LGA in Florida litigation. On August 14, 1998, the Honorable Terry C. Kern, Chief Judge of the United States District Court for the Northern District of Oklahoma, entered his order

withdrawing the reference of this case from the bankruptcy court, effectively divesting this Court of jurisdiction in the matter. *See Docket No. 23*, Adv.Proc. No. 98–0016–M.

**Procedural Background**

On January 13, 1998, Abraham, Hood and Goldman Sachs filed their initial Disclosure Statement and Plan of Reorganization in each of these Chapter 11 cases. *See LGA Docket Nos. 138 and 139 and Sunrise Docket Nos. 196 and 197*. On January 16, 1998, LGA filed its initial Disclosure Statement and Plan of Reorganization in each of these Chapter 11 cases. *See LGA Docket Nos. 141 and 142 and Sunrise Docket Nos. 198 and 199*. The Court set the hearing to consider each of the competing disclosure statements on March 3, 1998. *See LGA Docket No. 147 and Sunrise Docket No. 204*. At the request of the parties, these hearings were continued several times. Hearings on the disclosure statements were ultimately held on May 19, 1998. Amended plans and disclosure statements were filed by Abraham, Hood and Goldman Sachs on March 3, 1998, and again (the Second Amended Plan) on May 18, 1998. LGA also filed an amended plan on February 18, 1998, and a second amended plan and first amended disclosure statement on May 18, 1998.[17]

On May 19, 1998, each of the amended disclosure statements was approved. The Court directed the parties to prepare an agreed order approving the disclosure statements and scheduling concurrent deadlines for submission of ballots, objections to confirmation, and statements of preference between the competing plans. Such an order was submitted to the Court on May 28, 1998, and signed the same day. Said order set July 13, 1998, as the deadline for submission of ballots and/or objections to confirmation, and scheduled a hearing on confirmation on July 22, 1998. Due and proper notice of the confirmation hearing and the deadline for filing ballots and/or objections was given to all creditors and parties in interest.

The July 28, 1998, hearing was treated as a status hearing. At that hearing, the Court

---

17. In each instance, identical plans and disclosure statements (and amendments as well) were filed in each case. For purposes of convenience, these items are referred to in the singular.

was informed that Goldman Sachs had withdrawn its support of the plan it had proposed with Abraham and Hood, and was now supporting the Second Amended Plan submitted by LGA. In addition, Abraham and Hood informed the Court that they no longer sought confirmation of their plan, and, with the permission of the Court, withdrew the same from consideration. The Court then set an evidentiary hearing on the issue of confirmation of the Second Amended Plan of LGA on August 28, 1998. The parties represented to the Court that the main evidentiary issue for the Court's consideration dealt with the substantive consolidation of the estates of LGA and Sunrise contemplated under the Second Amended Plan.

On September 21, 1998, LGA filed its Third Amended Plan. The only change effectuated by the Third Amended Plan dealt with the Class 4 claims of Levie and Beneficial as a result of a pending sale of the real estate collateral securing the claims of those creditors. The Second Amended Joint Plan of Reorganization provided for those claims to be satisfied by curing any delinquency and then resuming monthly payments to satisfy the mortgage obligations. On September 8, 1998, the Court issued the Order Authorizing the Sale of Property of the Estate Free and Clear of Liens, Claims and Interest, approving the sale of the Ormond Residence. Proceeds from the sale of the Ormond Residence will be sufficient to pay the claims of Levie and Beneficial in full.[18] The Third Amended Joint Plan of Reorganization provides for payment in full of the amounts, if any, determined to be due to the Class 4 claimants in Adversary Proceeding No. 96–0265–M, upon the entry of a final order in said adversary proceeding.

On September 22, 1998, this Court entered an order in accordance with 11 U.S.C. § 1127, requiring LGA to give notice of the Third Amended Plan to all creditors and parties in interest, including but not limited to Levie and Beneficial, and providing them with an opportunity to object to the changes contained in the Third Amended Plan. The deadline for the filing of any such objections was October 13, 1998. Notice was properly given, and no objections or changes in balloting were filed. Accordingly, the Court is now in position to consider confirmation of the Third Amended Plan.

**Substance of the Plan**

In substance, the Third Amended Plan is a liquidating plan. Under its terms, proceeds from the sale of Sunrise Island and other assets will be used to pay creditors. The Third Amended Plan calls for the substantive consolidation of the estates of LGA and Sunrise *ab initio*. The creditors of the consolidated estate are then divided into the following classes:

Class 1—Administrative Claims Allowed under § 507(b)

Class 2—The Allowed Secured Claim of Goldman Sachs & Company

Class 3—The Allowed Secured Claim of Robert Abraham and Charles D. Hood, Jr.

Class 4—The Allowed Secured Claim of Levie Mortgage Investment Corporation and its successor, Beneficial Savings Bank, F.S.B.

Class 5—The Allowed Secured Claim of Suntrust Bank

Class 6—The Allowed Unsecured Priority Claim of Lauderdale County, Tennessee

Class 7—The Allowed Unsecured Priority Claim of the Internal Revenue Service

Class 8—The Allowed Unsecured Priority Claim of the Colorado Department of Revenue

Class 9—The Unsecured Claims against Sunrise and LGA

Class 10—The Interests of the Equity Holders of LGA

Class 11—The Interest of the Holders of General and Limited Partnership Interests in Sunrise

---

18. The initial sale of the Ormond Residence did not close, and LGA has retained the earnest deposit generated as a result of the contract of sale in that transaction. Counsel for LGA has advised the Court that another buyer has been located, and that LGA expects to sell the Ormond Residence in the near future.

The Third Amended Plan provides for the following treatment for each such class:

Class 1—Payment in full upon the effective date of the Third Amended Plan

Class 2—Payment of $680,000 in full satisfaction of the Class 2 Claim upon the effective date of the plan

Class 3—Payment in full of whatever amounts are determined to be owing at the conclusion of the adversary proceeding currently pending between LGA and the Class 3 Claimants

Class 4—Payment in full of whatever amounts are determined to be owing at the conclusion of the adversary proceeding currently pending between LGA and the Class 4 Claimants

Class 5—Paid in accordance with the terms and provisions of the existing loan documentation between LGA and the Class 5 Creditor

Class 6—Payment in full upon the effective date of the Third Amended Plan

Class 7—Paid within thirty (30) days of determination of the amount of the allowed Class 7 Claim

Class 8—Paid within thirty (30) days of determination of the amount of the allowed Class 8 Claim

Class 9—Payment in full upon the effective date of the Third Amended Plan, with interest at the rate of six per cent (6%) per annum from and after February 7, 1996

Class 10—To retain their interests in LGA, upon payment in full of the Class 9 creditors

Class 11—To be canceled and these claimants will receive nothing by way of the Third Amended Plan

**Voting on the Third Amended Plan**

There are eleven (11) classes of interest holders or creditors set forth in the Third Amended Joint Plan of Reorganization. Only two classes are impaired: Class 2 consisting of the allowed secured claim of Goldman Sachs, and Class 11 consisting of the interest of the holders of general and limited

partnership interests in Sunrise. The unimpaired classes, i.e., Class 1, and Classes 3 through 10 are deemed to have accepted the Plan. *See* § 1126(f). LGA received the following ballots with regard to LGA's Second Amended Joint Plan of Reorganization.

**Class 1—Administrative Claims Allowed Under § 507(b)**

The Plan was accepted by two (2) creditors/claimants constituting a 100% acceptance by Class 1. Robert Lobato with a claim of $15,000.00 and a claim of $55,000.00 voted in favor of the Plan. Martin Moyers with a claim of $112,201.75 and a claim of $7,374.00 voted in favor of the Plan.

**Class 2—The Allowed Secured Claim of Goldman Sachs & Company**

The Plan was accepted by one (1) creditor/claimant, constituting a 100% acceptance by Class 2. Goldman Sachs with a claim of $680,000.00 voted in favor of the Plan.

**Class 3—The Allowed Secured Claim of Robert Abraham and Charles D. Hood, Jr.**

The Plan was rejected by 2 claimants/creditors constituting a 100% rejection by Class 3. Robert Abraham with a claim of $33,000.00 voted against the Plan. Charles D. Hood, Jr. with a claim of $33,000.00 voted against the Plan.

**Class 4—The Allowed Secured Claim of Levie and its successor, Beneficial**

With regard to Class 4 claims no timely ballots were received. Beneficial with a claim in the amount of $200,251.00 voted against the Plan. However, Beneficial's ballot was submitted untimely. In addition, as noted *infra* p. 290 n. 23, Beneficial has admitted that its claim is not impaired.

**Class 5—The Allowed Secured Claim of Suntrust Bank**

With regard to Class 5 claims, no timely or untimely ballots were received.

**Class 6—The Allowed Unsecured Priority Claim of Lauderdale County, Tennessee**

With regard to Class 6 claims, no timely or untimely ballots were received.

### Class 7—The Allowed Unsecured Priority Claim of the Internal Revenue Service

With regard to Class 7 claims, no timely or untimely ballots were received.

### Class 8—The Allowed Unsecured Priority Claim of the Colorado Department of Revenue

With regard to Class 8 claims, no timely or untimely ballots were received.

### Class 9—The Unsecured Claims against Sunrise and LGA

Four (4) Class 9 Creditors voted on the Third Amended Plan. Three (3) of the creditors with total claims of $14,095.69 voted in favor of the Third Amended Plan. Only one (1) creditor, Campbell Bradley with a claim of $27,256.15 voted against the Third Amended Plan.

### Class 10—The Interests of the Equity Holders of LGA

Robert Lobato, 94.69% shareholder in LGA, submitted the only vote and voted in

favor of the Plan, constituting a 100% acceptance by Class 10.

### Class 11—The Interest of the Holders of General and Limited Partnership Interests in Sunrise

Class 11 claimants' interests will be canceled. They will receive no distribution under the Plan due to the proposed *ab initio* substantive consolidation of Sunrise Island and LGA. Class 11, the equity security holders of LGA, with Mr. Lobato holding 94.69% of said equity securities, has accepted the Third Amended Plan. *See* p. 289 *supra.*

To the extent the "Conclusions of Law" contain any items which should more appropriately be considered "Findings of Fact," they are incorporated herein by this reference.

### Conclusions of Law

The issue before the Court is whether the Third Amended Plan meets the requirements for confirmation set forth in § 1129(a) of the Bankruptcy Code.[19] Many of the require-

19. Section 1129(a) of the United States Bankruptcy Code reads as follows:

*1129. Confirmation of plan*

(a) The court shall confirm a plan only if all of the following requirements are met:

(1) The plan complies with the applicable provisions of this title.

(2) The proponent of the plan complies with the applicable provisions of this title.

(3) The plan has been proposed in good faith and not by any means forbidden by law.

(4) Any payment made or to be made by the proponent, by the debtor, or by a person issuing securities or acquiring property under the plan, for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the court as reasonable.

(5)(A)(i) The proponent of the plan has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the debtor, an affiliate of the debtor participating in a joint plan with the debtor, or a successor to the debtor under the plan; and

(ii) the appointment to, or continuance in, such office of such individual, is consistent with the interests of creditors and equity security holders and with public policy; and

(B) the proponent of the plan has disclosed the identity of any insider that will be employed or retained by the reorganized debtor, and the nature of any compensation for such insider.

(6) Any governmental regulatory commission with jurisdiction, after confirmation of the

plan, over the rates of the debtor has approved any rate change provided for in the plan, or such rate change is expressly conditioned on such approval.

(7) With respect to each impaired class of claims or interests—

(A) each holder of a claim or interest of such class—

(i) has accepted the plan; or

(ii) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date; or

(B) if section 1111(b)(2) of this title applies to the claims of such class, each holder of a claim of such class will receive or retain under the plan on account of such claim property of a value, as of the effective date of the plan, that is not less than the value of such holder's interest in the estate's interest in the property that secures such claims.

(8) With respect to each class of claims or interests—

(A) such class has accepted the plan; or

(B) such class is not impaired under the plan.

(9) Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the plan provides that—

(A) with respect to a claim of a kind specified in section 507(a)(1) or 507(a)(2) of this title, on the effective date of the plan, the holder of such claim will receive on account of such

ments of § 1129 are met in this case without dispute. The only objection to confirmation was raised on behalf of the Class 3 Creditors, Abraham and Hood. Their objection focuses on the issue of substantive consolidation of the bankruptcy estates of LGA and Sunrise proposed in the Third Amended Plan and the effect of its confirmation upon the litigation pending between LGA and Abraham and Hood. Notwithstanding the scope of this objection and in order to make the ruling of the Court as clear as possible, the Court shall discuss each subsection of § 1129 in turn, applying it to the facts at bar.

*Sections 1129(a)(1) through (3) and Substantive Consolidation*

Subsections (1) through (3) of § 1129(a) of the Bankruptcy Code require a plan, as well as its proponent, to comply with the applicable provisions of Title 11 and also require that the "plan has been proposed in good faith and not by any means forbidden by law." Abraham and Hood argue that the Third Amended Plan does not comply with these sections for two somewhat related reasons: (1) the Third Amended Plan improperly calls for the substantive consolidation of the bankruptcy estates of LGA and Sunrise; and (2) confirmation of the plan would somehow create new theories of recovery for the reorganized debtor against Abraham and Hood in the adversary proceeding currently

pending in this Court. The Court will consider each in turn.

 The equitable power of a bankruptcy court to order the substantive consolidation of two or more bankruptcy estates has long been recognized. *See Holywell Corp. v. Bank of New York (In re Holywell)*, 59 B.R. 340, 346 (S.D.Fla.1986) (citations omitted). The effect of a substantive consolidation of two bankruptcy estates is to make them become one. Instead of two separate legal entities with two separate sets of assets and liabilities, the assets and liabilities of the two entities are pooled. In addition, all intercompany liabilities are canceled. *See e.g., In re The Leslie Fay Companies, Inc.*, 207 B.R. 764, 779 (Bankr.S.D.N.Y.1997) (citation omitted); *Chemical Bank New York Trust Co. v. Kheel*, 369 F.2d 845, 846 (2nd Cir.1966). In cases in which one or both of the consolidating entities are insolvent, substantive consolidation may well result in a significant change in the amount of distribution which creditors of either entity may expect to receive. Put another way, if a solvent debtor (who could pay all of his creditors in full) is substantively consolidated with an insolvent debtor (who cannot make full payment to creditors), the effect of consolidation will be that the creditors of the formerly solvent debtor will receive less than full payment of their claims, while increasing the distribution to creditors of the insolvent debtor. In such a scenario,

claim cash equal to the allowed amount of such claim;

(B) with respect to a class of claims of a kind specified in section 507(a)(3), 507(a)(4), 507(a)(5), 507(a)(6), or 507(a)(7) of this title, each holder of a claim of such class will receive—

(i) if such class has accepted the plan, deferred cash payments of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or

(ii) if such class has not accepted the plan, cash on the effective date of the plan equal to the allowed amount of such claim; and

(C) with respect to a claim of a kind specified in section 507(a)(8) of this title, the holder of such claim will receive on account of such claim deferred cash payments, over a period not exceeding six years after the date of assessment of such claim, of a value, as of the effective date of the plan, equal to the allowed amount of such claim.

(10) If a class of claims is impaired under the plan, at least one class of claims that is im-

paired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider.

(11) Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

(12) All fees payable under section 1930 of title 28, as determined by the court at the hearing on confirmation of the plan, have been paid or the plan provides for the payment of all such fees on the effective date of the plan.

(13) The plan provides for the continuation after its effective date of payment of all retiree benefits, as that term is defined in section 1114 of this title, at the level established pursuant to subsection (e)(1)(B) or (g) of section 1114 of this title, at any time prior to confirmation of the plan, for the duration of the period the debtor has obligated itself to provide such benefits.

substantive consolidation has the potential to radically alter the reasonable rights and expectations of the parties. It is for this reason that courts have been extremely hesitant in granting requests for substantive consolidation, and have required an evidentiary showing that substantive consolidation is warranted, even in the context of plan confirmation. *See In re Silver Falls Petroleum Corporation*, 55 B.R. at 497.

■ The United States Court of Appeals for the Eleventh Circuit has set forth the following standard for use in determining whether substantive consolidation is warranted in a given case:

It is agreed that the basic criterion by which to evaluate a proposed substantive consolidation is whether "the economic prejudice of continued debtor separateness" outweighs "the economic prejudice of consolidation." In other words, a court must "conduct a searching inquiry to ensure that consolidation yields benefits offsetting the harm it inflicts on objecting parties."

The D.C. Circuit has elaborated a standard, which we adopt today, by which to determine whether to grant a motion for substantive consolidation. Under this standard, the proponent of substantive consolidation must show that (1) there is substantial identity between the entities to be consolidated; and (2) consolidation is necessary to avoid some harm or to realize some benefit. When this showing is made, a presumption arises "that creditors have not relied solely on the credit of one of the entities involved." Once the proponent has made this prima facie case for consolidation, the burden shifts to an objecting creditor to show that (1) it has relied on the separate credit of one of the entities to be consolidated; and (2) it will be prejudiced by substantive consolidation. Finally, if an objecting creditor has made this showing, "the court may order consolidation only if it determines that the demonstrated benefits of consolidation 'heavily' outweigh the harm."

*Eastgroup Properties v. Southern Motel Assoc., Ltd.*, 935 F.2d 245, 249 (11th Cir.1991) (citations omitted) (footnote omitted); *see*

*also In re Standard Brands Paint Co.*, 154 B.R. at 568 (citation omitted) (courts considering the issue of substantive consolidation are to do so "in terms of balancing the benefits that substantive consolidation would bring against the harm that substantive consolidation would cause"). This involves consideration by the Court of the following factors:

 A. Necessity of consolidation due to interrelationship among debtors;

 B. Whether the benefits of consolidation outweigh the harm to creditors and

 C. Prejudice that will result from lack of consolidation.

*In re Silver Falls Petroleum Corporation*, 55 B.R. at 498. The determination of whether substantive consolidation is warranted must be done on a case-by-case basis. *See In re Steury*, 94 B.R. 553, 554 (Bankr.N.D.Ind. 1988).

■ Section 1123(a)(5)(C) of the Bankruptcy Code states that a plan of reorganization may provide for "the merger or consolidation of the debtor with one or more persons." This provision in the Bankruptcy Code indicates Congress' intent that a Chapter 11 debtor be free to merge or consolidate with another entity as part of the reorganization process. At least one court has confirmed a Chapter 11 plan calling for the substantive consolidation of several bankruptcy estates. *See In re Standard Brands Paint Co.*, 154 B.R. 563 (Bankr.C.D.Cal. 1993). Not every plan which proposes substantive consolidation is confirmed. *See In re Silver Falls Petroleum Corporation*, 55 B.R. 495 (Bankr.S.D.Ohio 1985); *see also In re N.S. Garrott & Sons*, 48 B.R. 13 (Bankr. E.D.Ark.1984) (confirmation of plan calling for substantive consolidation denied where substantive consolidation not expressly mentioned in plan or disclosure statement, classes improperly designated in plan, and each estate had different creditors and different assets, assets in one case were of a more liquid quality than in the other, and debtor estates held interests adverse to one another). In the present case, the Court finds that substantive consolidation, and hence confirmation of the Third Amended Plan, is justified.

With respect to the interrelationship between LGA and Sunrise, the evidence received at the hearing on confirmation established the following:

1. All of the partners in Sunrise Island are also directors, officers, shareholders or employees of LGA.

2. Sunrise was formed for the sole purpose of purchasing Sunrise Island.

3. The Sunrise partnership was formed for the purpose of avoiding negative tax consequences.

4. LGA and Sunrise had common offices and, to a large extent, common employees.

5. The Court received detailed and elaborate expert testimony which would convince the Court that the establishment of Sunrise was a "sham" for tax purposes.

6. Certain of the individuals responsible for the "management" of Sunrise Island in fact reported to Carwin, who held *no* ownership interest in Sunrise. *See Trustee's Exhibit 24*, p. 26, lines 11 through 17; *Trustee's Exhibit 23*, p. 31, lines 19 through 23.

7. The contractual obligations between Sunrise and LGA (e.g., note payments and the duties of LGA to "manage" Sunrise Island under the management agreement) were often ignored.

8. The formation of Sunrise, the transfer of Sunrise Island by LGA to Sunrise and the timber sale to P.E. Barnes took place during the Colorado Litigation, and operated as an attempt to insulate those assets from the reach of the judgment ultimately obtained by Lobato. Given the other fraudulent conduct of Carwin and Carolyn during this same time period as determined by the Volusia County Court, this Court struggles to see the formation of

Sunrise as a legitimate business undertaking.

These facts are indicative of a "substantial identity" between LGA and Sunrise, the type of which is often found where cases are substantively consolidated. *See In re Reider*, 31 F.3d 1102, 1105 (11th Cir.1994) (citing *see e.g. Fish v. East*, 114 F.2d 177 (10th Cir. 1940); *see also Stone v. Eacho*, 127 F.2d 284 (4th Cir.1942) *cert. denied* 317 U.S. 635, 63 S.Ct. 54, 87 L.Ed. 512 (1942); *see Maule Indus. v. Gerstel*, 232 F.2d 294 (5th Cir. 1956)).

Counsel for Abraham and Hood, the only parties objecting to the substantive consolidation,[20] alleges that some substantive consolidation will result in the advancement of additional theories of liability by LGA against Abraham and Hood in their pending adversary proceeding. The Court made detailed inquiry on the record as to the exact nature of the additional "theories of liability" which would be created against Abraham and Hood if the Third Amended Plan were confirmed. The response was less than clear. Counsel for LGA, the proponent of both plans, has unequivocally stated both on the record in open court and in briefs submitted to this Court in support of confirmation, that confirmation will *not* create or enhance any additional theories of liability against Abraham and Hood. The only thing substantive consolidation would do is place a "cap" on the amount of damages LGA could claim against Abraham and Hood in an amount equal to that which LGA pays to Goldman Sachs.[21]

■ The adversary proceeding between Abraham and Hood and the Debtor is pending in this Court. This Court is not likely to forget the representations made by counsel for LGA in an effort to obtain confirmation of the plan. This Court believes that LGA is judicially estopped from taking any position

20. It is interesting to note that each of the plans of reorganization submitted by Abraham and Hood *also* called for substantive consolidation. *See LGA Docket Nos. 139, 174 and 196 and Sunrise Docket Nos. 197, 214 and 245.* Their plan was withdrawn on the eve of the August 28, 1998, hearing on confirmation. One of the main differences between the competing plans was that the plan proposed by Abraham and Hood, not surprisingly, called for dismissal of the all pending litigation against them.

21. Counsel for LGA and Goldman Sachs both indicated that the $680,000.00 payment figure contained in the Third Amended Plan reflected a significant compromise and was less than the face amount owed to Goldman Sachs under the terms and provisions of its loan documentation.

other than that taken in support of confirmation; namely, the confirmation of the Third Amended Plan creates no new rights or liabilities but leaves the litigation between LGA and Abraham and Hood in the same form as it existed immediately prior to confirmation. This Court believes that confirmation of the Third Amended Plan will not harm the position of Abraham and Hood, either in their status as creditors of this estate or as litigants against LGA.

There is certainly no harm to creditors if substantive consolidation is allowed and these plans are confirmed. Substantive consolidation will result in *no* economic detriment to the creditors of this estate. The Third Amended Plan provides for payment in full of all claims against both LGA and Sunrise which are undisputed, and reserves sufficient funds to pay those claims which are disputed, should the Debtor be ultimately unsuccessful in the litigation which will remain pending after confirmation.

Abraham and Hood argue that the benefit which will be realized by plan confirmation does not justify substantive consolidation. They argue that a plan need not call for substantive consolidation in order to provide for payment in full to creditors, and that the Court has the power to fashion a remedy (i.e., draft an amendment to the Plan) which will eliminate the "harm" brought upon them by substantive consolidation. This Court will not enter into the business of drafting plans. These cases have been pending almost three years. All creditors and parties-in-interest have been given the opportunity to present a plan. Only LGA, Abraham and Hood ever undertook such an endeavor; Abraham and Hood withdrew their plan immediately prior to its consideration by this Court. As noted above, the Court finds no harm in the substantive consolidation of these two estates. If the Third Amended Plan is not confirmed, significant litigation will continue which otherwise would be resolved. The estates of LGA and Sunrise have, to a large degree, been reduced to a sum of money. It is time to distribute that money and press these cases forward to their ultimate conclusion.

The Court finds that substantive consolidation of these two estates is justified under the facts of these cases. The Court further finds that the plan has been proposed by LGA in good faith and not by any means forbidden by law. The Court further finds that the plan complies with the provisions of Title 11 and that its proponent has done so as well. The Court finds that the Third Amended Plan complies with §§ 1129(a)(1) through (3) of the Bankruptcy Code.

*Section 1129(a)(4)—Court Approval of Compensation*

Section 1129(a)(4) of the Bankruptcy Code requires that all payments to professionals for services rendered be approved by the Court prior to confirmation or subject to Court approval before payment. The Third Amended Plan requires that all such fees are subject to Court approval, and provides that this Court retain jurisdiction to consider any and all such applications which may be filed after confirmation. The Court finds that the Third Amended Plan complies with § 1129(a)(4) of the Bankruptcy Code.

*Section 1129(a)(5)—Disclosure of Officers and Insiders of the Reorganized Debtor*

Section 1129(a)(5) of the Bankruptcy Code requires the proponent of a plan to disclose the identity of all officers and directors of the reorganized debtor. In addition, this section requires that the identity of all insiders to be employed by the reorganized debtor, as well as their proposed compensation, be disclosed. In the present case, the reorganized debtor will be managed by Robert Lobato, an insider. The compensation which Lobato has received prior to confirmation has been disclosed and has been subject to Court approval. Lobato will receive no additional compensation for his services after confirmation. The Court finds that the Third Amended Plan complies with § 1129(a)(5) of the Bankruptcy Code.

*Section 1129(a)(7)—Acceptance of the Plan by An Impaired Class*

Section 1129(a)(7)(A) [22] of the Bankruptcy Code requires that each *impaired* class of

---

**22.** Section 1129(a)(7)(B) deals with situations where a secured creditor has made the election

allowed under § 1111(b) of the Bankruptcy Code. No such election has been made by any of

creditors either accept the plan or receive property of a value "not less than the amount that such holder would receive or retain if the debtor were liquidated under chapter 7 of this title on such [effective] date." § 1129(a)(7)(A). LGA states that only two classes, Class 2 (Goldman Sachs) and Class 11 (the equity security holders of LGA, of which Mr. Lobato holds 94.69% of said equity securities), are impaired under the Third Amended Plan. Both of these classes have accepted the Third Amended Plan. Classes 4 through 8 did not cast any votes with respect to the Third Amended Plan; they are therefore deemed to have accepted the Third Amended Plan. *See In re Ruti–Sweetwater, Inc.*, 836 F.2d 1263, 1266–1267 (10th Cir. 1988).

The creditors in Class 3 and Class 4 have argued that their claims are impaired by the Third Amended Plan. Under its terms, the Class 3 Claimants, Abraham and Hood, will be paid the full amount of their claims as determined by the Court upon the conclusion of Adversary Proceeding No. 96–0295–M, subject to any right of offset which the reorganized debtor may have as a result of the Court's ruling. Similarly, the Third Amended Plan provides that, Beneficial, the Class 4 Claimant, is to be paid in the full amount of its claim as determined by the Court upon the conclusion of Adversary Proceeding No. 96–0295–M. Beneficial filed its objection stating that it held an impaired claim and did not accept the Third Amended

Plan. *See LGA Docket No. 218.* Beneficial changed its position on the issue of impairment at the initial hearing on confirmation.[23] The Court does not believe that the claims of creditors are impaired by a plan which provides for full payment of those claims after their final determination by a court of competent jurisdiction. *See In re Smith*, 123 B.R. 863, 867 (Bankr.C.D.Cal.1991) ("... a plan may limit payment of claims to 'the extent allowed,' without impairing them; for until claims are allowed, the holders thereof are not entitled to distribution from the bankruptcy estate. However, impairment results if the plan denies claimholders the right to payment to the extent their claims are ultimately allowed.").

Abraham and Hood do not argue monetary impairment; instead, they argue that the substantive consolidation of the estates of LGA and Sunrise contemplated by the Third Amended Plan will impair their rights, remedies and defenses in Adversary Proceeding No. 96–0295–M. In its discussion of the issue of substantive consolidation at p. 288 *supra*, the Court ruled that the substantive consolidation contemplated by the Third Amended Plan does not create new theories of liability or recovery for the reorganized debtor against Abraham and Hood and that the reorganized debtor, on the basis of statements made to the Court in support of confirmation, would be estopped to argue to the

the secured creditors in this case; accordingly, the section is inapplicable. *See* § 1111(b).

**23.** The following exchange took place at the July 22, 1998, hearing on confirmation:

MR. RAYMENT (counsel for Beneficial): Your Honor, we had originally, in our objection, submitted several arguments in objection to confirmation of the plan, three of which I think we can deal with. Those had to do with whether or not our claim and our class—I should point out Beneficial is within its own class, class four. One of the issues in our objection was whether or not our class was impaired. From discussions, notes on—with counsel, it's my understanding that the plan as proposed contemplates payment of Beneficial's claim, if the Court rules that the claim is valid in the adversary proceeding.
The plan did not address whether that claim payment would include interest, costs and at-

torneys' fees if awarded by this Court in the adversary proceeding. So I was concerned about impairment from that side. Its my understanding that the plan, at least as proposed and contemplated, will pay interest, costs and attorneys' fees, in addition to the base claim amount, if those are awarded by this Court.
THE COURT: Mr. O'Connor, that's how I read it. Is that correct?
MR. O'CONNOR: Yes, Your Honor.
THE COURT: All right, thank you. Please continue.
MR. RAYMENT: Thank you, Your Honor. Given that understanding, my objection, based on the [§] 1129(a)(7), (a)(8) and (a)(10) go away. I will agree with the analysis that the property is sufficient right now to cover our claim, at least at this point in time, with the accrued interest and fees. And therefore, as proposed right now, it is an unimpaired class.
*Transcript of Proceedings Held July 22, 1998,* p. 23, line 3, through p. 24, line 8.

contrary. The Court finds no impairment of the claim of either Abraham or Hood.[24]

Abraham and Hood also argue that the Third Amended Plan is not "fair and equitable" because it does not provide for payment to creditors who failed to file a proof of claim prior to the May 31, 1996, deadline established by the Court. The Court notes that none of the creditors who are affected by this provision have cast ballots or filed any objection to the Third Amended Plan, notwithstanding the fact that the Court required that these creditors receive notice in a form which specifically informed them of the effect of confirmation.[25] Having failed to object or to vote, those creditors are deemed to have accepted the Third Amended Plan. *See In re Ruti–Sweetwater*, 836 F.2d at 1266–1267. The Court finds that the Third Amended Plan complies with § 1129(a)(7) of the Bankruptcy Code.

*Section 1129(a)(8)—Acceptance of the Plan by Creditors*

Section 1129(a)(8) of the Bankruptcy Code requires that each class of creditors either accept the plan or not be impaired under the terms of the plan. The Third Amended Plan meets these requirements. The only classes which have not accepted the Third Amended Plan (Class 3—Abraham and Hood and Class 9—the Unsecured Creditors) are not impaired under its terms.[26] The Court finds that the Third Amended Plan complies with § 1129(a)(8) of the Bankruptcy Code.

---

24. Even if the claims of Abraham, Hood, Beneficial and/or Levie were impaired, such impairment would not preclude confirmation. With respect to each of these claimants, the Third Amended Plan provides that they shall be paid the entire amount determined by the Court to be due and owing to them once that amount (if any) has been finally determined. Under § 1129(b)(2)(A)(I) and (II), a plan is "fair and equitable" with respect to its treatment of impaired secured claims if it provides that the holders of such claims retain the liens securing their claims, and receive deferred cash payments in an amount equal to the value of their secured claim as of the effective date of confirmation. The proposed treatment of Abraham, Hood, Beneficial and Levie falls squarely within the parameters of § 1129(b)(2)(A). Furthermore, notwithstanding the position of Beneficial to the contrary, the Third Amended Plan does not violate the absolute priority rule set forth in § 1129(b)(2)(B). While the shareholders of LGA will retain their equity interest in the company, all creditors (including Beneficial) will be paid the entire amount of their allowed claim, once the same is determined. Where claims are paid in full, the fact that equity interest holders retain their ownership interest in the debtor does not violate the absolute priority rule. *See Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 202, 108 S.Ct. 963, 966, 99 L.Ed.2d 169, 176 ("the absolute priority rule provides that a dissenting class of unsecured creditors must be provided for in full before any junior class can receive or retain any property [under a reorganization] plan.") (brackets in original).

25. Each creditor was sent the following notice:

On March 15, 1998[sic], the Court set May 31, 1996 as the deadline for filing proofs of claim in this case. The schedules that the Debtor filed in this case and the register of claims indicate that there may be creditors who did not file a proof of claim by that date.

Two competing Chapter 11 plans for the Debtor have been filed in this case. One was filed by Robert Abraham and Charles D. Hood, Jr., each of whom are creditors of Limited Gaming of America, Inc. (the "Creditors"). The other was filed by Limited Gaming of America, Inc. ("LGA"). The Creditors' Plan provides for payment of allowed unsecured claims for which proofs of claim are filed after the May 31, 1996 deadline, so long as such claims are properly reflected in proofs of claim that are filed no later than the day before the Court's hearing on confirmation of the two plans begins. That date is reflected in the Order Approving Disclosure Statements and Fixing Time for Filing Acceptances or Rejections of competing Chapter 11 Plans, Combined with Notice Thereof, a copy of which should be provided to you with this notice.

**You are therefore placed on notice that if you hold a claim for which a proof of claim was not filed on or before May 31, 1996, and which is not otherwise allowable, you must file a proof of claim with the Clerk of the Court, 224 S. Boulder, Suite 105, Tulsa, Oklahoma 74103, before the date stated above in order to have your claim considered for allowance and, if allowed, payment under the Creditors Plan. You are also advised that the Court may confirm only one Chapter 11 plan. If the Court does not confirm the Creditors' Plan, the filing of a proof of claim after May 31, 1996 will have no consequence.**

*See LGA Docket No. 204, see Sunrise Docket No. 258* (emphasis in original). This notice, prepared by counsel for Abraham and Hood, could not have been more clear regarding the effect of the Third Amended Plan upon creditors who had not filed a proof of claim prior to May 31, 1996.

26. The Class 9 Creditors are paid in full with interest as of the effective date of the Third Amended Plan.

*Section 1129(a)(9)—Payment of Administrative Claims*

Under Section 1129(a)(9) of the Bankruptcy Code, all creditors with administrative claims as defined under § 507 of the Bankruptcy Code must be paid in full on the effective date of the plan, unless the holder of the claim agrees otherwise. In addition, § 1129(a)(9)(C) requires that tax priority claims under § 507(a)(8) be paid over a period of not more than six years, at an appropriate rate of interest. The Third Amended Plan provides that all administrative expenses under § 507(a)(1) will be paid in full on the effective date of the plan. The priority claim of the Internal Revenue Service (Class 7) is to be paid in full once its amount is determined, either by agreement of the parties or the institution of an adversary proceeding. The only other administrative claim falling under this section is the claim of the Colorado Department of Revenue (Class 8). This claim is disputed; once determined, any such claim will be paid over a period of six years, with interest. Neither the Internal Revenue Service nor the Colorado Department of Revenue have objected to the proposed treatment of their claims under the Third Amended Plan. The Court finds that the Third Amended Plan complies with § 1129(a)(9) of the Bankruptcy Code.

*Section 1129(a)(10)—Acceptance by at Least One Impaired Class of Creditors*

Section 1129(a)(10) of the Bankruptcy Code requires that at least one class of creditors whose claims are impaired accept the plan. Both classes of creditors that are impaired under the terms of the Third Amended Plan have accepted it. The Court finds that the Third Amended Plan complies with § 1129(a)(10) of the Bankruptcy Code.

*Section 1129(a)(11)—Feasibility*

Section 1129(a)(11) of the Bankruptcy Code requires that "confirmation of the plan is not likely to be followed by the liquidation, or the need for further reorganization" of the reorganized debtor, unless contemplated by the terms of the proposed plan. The Third Amended Plan is in large part a liquidating plan. The reorganized debtor will have sufficient cash available as of the effective date of the plan to pay all creditors in full. No party has raised any concerns regarding feasibility to the Court. The Court finds that the Third Amended Plan is feasible, and that it complies with § 1129(a)(11) of the Bankruptcy Code.

*Section 1129(a)(12)—Payment of Fees to the Office of the U.S. Trustee*

Section 1129(a)(12) of the Bankruptcy Code requires that all fees owed to the Office of the United States Trustee be paid as of the effective date of the plan. Both Debtors are current with respect to said payments. The Third Amended Plan provides for the future payment of such fees. The U.S. Trustee has advised the Court that it supports confirmation of the Third Amended Plan. The Court finds that the Third Amended Plan complies with § 1129(a)(12) of the Bankruptcy Code.

*Inapplicable Sections of § 1129*

Sections 1129(a)(6) and (13) of the Bankruptcy Code deal with approval by the appropriate government regulatory commission of any rate change proposed by the debtor and continuation by the reorganized debtor of payment of retirement benefits, respectively. Neither section is applicable in the present case.

**Conclusion**

The Court finds that the provisions of § 1129(a) are met with respect to the Third Amended Plan. The Third Amended Plan should be confirmed. A separate order in accordance with this memorandum opinion is entered concurrently herewith.