### In re AFFILIATED FOODS, INC., Belt AF Super, Inc., Hy–Klas Food Products, Inc., Debtors.

Nos. 99–50505–1–11, 99–50966–1–11, 99–50967–1–11.

United States Bankruptcy Court, W.D. Missouri, Western Division.

June 19, 2000.

Thomas G. Stoll, Kansas City, MO, for debtors.

Brian T. Fenimore, Kansas City, MO, Kay Standridge Kress, Detroit, MI, Brian M. Holland, Kansas City, MO, for Unsecured Creditors Committee.

Craig Penrose, Des Plaines, IL, for Central States.

## MEMORANDUM OPINION AND ORDER

JERRY VENTERS, Bankruptcy Judge.

Affiliated Foods, Inc., ("Affiliated Foods") a member-owned cooperative grocery wholesaler based in St. Joseph, Missouri, filed a Chapter 11 petition in this Court on July 7, 1999. Two wholly owned subsidiaries, Hy–Klas Food Products, Inc., ("Hy–Klas") and Belt AF Super, Inc., ("Belt") filed their own Chapter 11 petitions on December 21, 1999. In all three instances, the companies had, prior to the bankruptcy filings, ceased their business operations and liquidated most of their assets. On March 29, 2000, the Unsecured Creditors Committee ("Committee") appointed by the United States Trustee in the Affiliated Foods case filed a Second Amended Chapter 11 Plan of Liquidation, and on April 11, 2000, the Committee filed a Revised Second Amended Disclosure Statement in connection with the Second Amended Plan of Liquidation. The Court gave preliminary approval to the Revised Second Amended Disclosure Statement and authorized the Committee to circulate the Disclosure Statement and Plan for balloting by the creditors. On May 23, 2000, the Court conducted a hearing on confirmation of the Committee's Second Amended Plan.

There are three primary issues presented for the Court's determination: (1) Whether the three bankruptcy cases filed by Affiliated Foods and its subsidiaries should be substantively consolidated; (2) whether a $1,046,283.76 statutory "withdrawal liability" claim asserted by the Central States, Southeast and Southwest Areas Pension Fund ("Central States") should be allowed as a general unsecured claim only to the extent of fifty percent of the amount of the liability, with the remaining fifty percent subordinated to the general unsecured creditors; and (3) whether the Second Amended Plan proposed by the Committee meets the best interests of creditors test of 11 U.S.C. § 1129(a)(7)(ii).

The Court has reviewed the Disclosure Statement and Plan, reviewed the suggestions filed by the parties, considered the evidence adduced at the hearing on May 23, 2000, conducted its own independent research, and is now prepared to rule.[1] This Memorandum Opinion and Order constitutes the Court's Findings of Fact and Conclusions of Law as required by Federal Rule of Bankruptcy Procedure 7052.

For the reasons stated herein, the Court will (1) order these three Chapter 11 cases substantively consolidated; (2) allow fifty percent of the Central States claim as a general unsecured claim in the consolidated case and subordinate the remaining fifty percent; and (3) find that the Second Amended Plan filed by the Committee meets the best interests of creditors test and can be confirmed.

## FACTUAL BACKGROUND

Affiliated Foods, founded in 1973, supplied grocery products and other related merchandise to approximately 400 member grocery stores in a four-state area, operating from a warehouse based in Elwood, Kansas, two miles west of St. Joseph, Missouri. In its best year, 1994–95, Affiliated Foods had sales of $169,900,000.00. However, a series of economic events occurred that, taken together, led to a rather rapid decline in the cooperative's fortunes, culminating in a sale of the company's assets in early 1999 and the filing of these liquidating Chapter 11 proceedings.[2] On June 1, 1999, Affiliated Foods sold substantially all of its assets, including its grocery inventory, to Affiliated Foods Cooperative, Inc., of Norfolk, Nebraska, for a total purchase price of approximately $11,779,000.00. The filing of the Chapter 11 petition followed on July 7, 1999. As of the end of April 2000, Affiliated Foods had approximately $4,428,000.00 in cash assets and approximately $1,045,000.00 in notes receivable, largely from its members. The bankruptcy schedules filed herein listed unsecured debts of approximately $4,123,000.00, excluding the $1,046,283.76 claim of Central States.

Hy–Klas was formed as a separate entity for the sole purpose of supplying milk and dairy products and by-products to member grocery stores. At the time of filing bankruptcy, Hy–Klas had cash assets of about $190,000.00. The other subsidiary, Belt, was an outgrowth of Affiliated Foods' screen printing department, and its primary focus was the production of specialty promotional items, such as caps, jackets, sweaters, cups, pencils, and the like. Belt also was the owner and operator of a grocery store in Blue Rapids, Kansas, which Affiliated Foods acquired at a sheriff's sale after the former owner went broke. That property was sold postpetition. At the time of the confirmation hearing, Belt had approximately $138,000.00 in cash assets, most of which was realized from the sale of the Blue Rapids property.

Additional facts will be developed in the discussion section of this opinion as necessary to a resolution of the issues presented.

## DISCUSSION

### I. Substantive Consolidation

 The Committee has filed a single, consolidated Chapter 11 Plan of Liqui-

---

1. This Court has jurisdiction over these matters pursuant to 28 U.S.C. §§ 1334 and 157. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (L).

2. According to the Disclosure Statement, the events that triggered Affiliated Foods' decline included a strike by Teamsters Union employees in 1996 and 1997; a court-ordered $1,800,000.00 settlement with Teamsters Union workers in 1997; fierce competition among supermarket warehouses; a continuing decline of communities and population in the company's rural trade area; the rapid expansion of Wal–Mart stores in the trade area; the proliferation of convenience stores in small rural communities in the trade area; the decline of regional supermarket cooperatives throughout the Midwest; the loss of three of the company's largest membership groups; and a failed attempt to either merge or sell the company in early 1999.

dation for Affiliated Foods and its two subsidiaries, Belt and Hy–Klas. The Plan (Art. X) provides for the consolidation of the assets and liabilities of the three companies and proposes that the creditors of the subsidiaries be treated as creditors of Affiliated Foods and be classified and treated according to the terms of the confirmed Plan.[3]

■ Although substantive consolidation is not specifically authorized by the Bankruptcy Code, the equitable power of a bankruptcy court to order the consolidation of two or more bankruptcy estates has been widely recognized. *Union Savings Bank v. Augie/Restivo Baking Co. (In re Augie/Restivo Baking Co., Ltd.),* 860 F.2d 515, 518 (2nd Cir.1988); *In re Limited Gaming of America, Inc.,* 228 B.R. 275, 286 (Bankr.N.D.Okla.1998); *In re Murray Industries, Inc.,* 119 B.R. 820, 829 (Bankr. M.D.Fla.1990); *Holywell Corp. v. Bank of New York (In re Holywell Corp.),* 59 B.R. 340, 347 (S.D.Fla.1986). It is a caselaw doctrine which has developed and evolved over the years, with its apparent origin in *Fish v. East,* 114 F.2d 177 (10th Cir.1940). The authority to substantively consolidate cases derives from the bankruptcy court's general equitable power, as implemented by 11 U.S.C. § 105(a), to issue those orders necessary to effectuate the provisions of the Bankruptcy Code. *Holywell,* 59

B.R. at 347. Additionally, the Code recognizes that, in some circumstances, consolidation of a debtor with one or more other persons or entities might be appropriate. 11 U.S.C. § 1123(a)(5)(C). This provision indicates Congress' intent that a Chapter 11 debtor be free to merge or consolidate with another entity as part of the reorganization process.[4] *Limited Gaming,* 228 B.R. at 287.

■ The sole purpose of substantive consolidation is to insure the equitable treatment of all creditors. *Augie/Restivo Baking Co., Ltd.,* 860 F.2d at 518. The effect of a substantive consolidation of two or more bankruptcy estates is to make them become one. Instead of several separate legal entities with separate assets and liabilities, the assets and liabilities of the entities are pooled, and the liabilities of the entities involved are then satisfied from the common pool of assets created by consolidation. In addition, all inter-company liabilities and claims are canceled. *Eastgroup Properties v. Southern Motel Assoc., Ltd.,* 935 F.2d 245, 248 (11th Cir. 1991); *Limited Gaming,* 228 B.R. at 286. In a Chapter 11 case, the creditors of the consolidated entities are combined for the purpose of voting on the reorganization (or liquidation) plan. *Augie/Restivo Baking,* 860 F.2d at 518.[5]

**3.** There has been no complaint by any creditor or interested party to the provision for substantive consolidation being included in the Plan of Liquidation, rather than being brought before the Court in a separate motion, with separate notice and hearing. Though unusual, it is not inappropriate to propose substantive consolidation in a Chapter 11 plan. *See In re Piece Goods Shops Co., L.P.,* 188 B.R. 778 (Bankr.M.D.N.C.1995). The Court finds that the creditors have been given appropriate notice of the proposal for substantive consolidation, in that the proposal was set out in a separate section prominently captioned, in bold face capital letters, "Substantive Consolidation." The Court held an all-day hearing on confirmation of the Plan, at which time any party could have raised objections, but none did so. Therefore, all parties have been accorded procedural due process. *Cf. In Re N.S. Garrott & Sons,* 48 B.R. 13, 18 (Bankr.E.D.Ark.1984).

**4.** 11 U.S.C. § 1123(a)(5)(C) provides: "(a) Notwithstanding any otherwise applicable nonbankruptcy law, a plan shall—(5) provide adequate means for the plan's implementation, such as—(C) merger or consolidation of the debtor with one or more persons."

**5.** It is not entirely clear what the burden of proof is for the proponent of substantive consolidation, but it appears that a preponderance of the evidence would be sufficient. Because of the potentially adverse effects of substantive consolidation, it has been said that "the burden of proof for those seeking consolidation is substantial and is independent of any defenses or adverse claims by those who might object to consolidation." *In re Snider Bros., Inc.,* 18 B.R. 230, 238 (Bankr.D.Mass.1982). *See also, N.S. Garrott & Sons,* 48 B.R. at 18.

■ Substantive consolidation results in a "redistribution of wealth" (if wealth can be said to exist in the context of bankruptcy) among the creditors of the various estates, because the consolidated entities are very unlikely to have the same assets, debts and creditors. For this reason, and because such a redistribution sometimes can have harsh results for some creditors, courts have traditionally held that substantive consolidation should be used sparingly. *Chemical Bank of New York Trust Co. v. Kheel,* 369 F.2d 845, 847 (2nd Cir. 1966). However, there is a more "modern" or "liberal" trend, of which this Court approves, toward allowing substantive consolidation, which has as its basis an increased judicial recognition of the widespread use of interrelated corporate structures by subsidiary corporations operating under a parent company's corporate umbrella for tax and business purposes. *In re Murray Industries, Inc.,* 119 B.R. 820, 829 (Bankr.M.D.Fla.1990). Under the liberal approach, substantive consolidation may be authorized whenever it will benefit the debtors' estates without betraying legitimate expectations of the debtors and their respective creditors. *Id.* at 829.

■ Inasmuch as the doctrine of substantive consolidation is based strictly on equity, there are no statutorily prescribed standards. Accordingly, the courts have developed various standards or guidelines that can be applied in any given case to determine whether substantive consolidation should be ordered, based on the facts of the particular case. 2 COLLIER ON BANKRUPTCY, ¶ 105.09[2], pp. 105–88 to 105–89 (Lawrence P. King, et al., 15th ed. rev. 1999). In any event, the analysis is highly fact-specific in every case, and the Court "must conduct a searching inquiry to insure that consolidation yields benefits offsetting the harm it inflicts on objecting parties." *Murray Industries,* 119 B.R. at 829. *See also, FDIC v. Colonial Realty Co.,* 966 F.2d 57 (2nd Cir.1992) (substantive consolidation analysis requires "a searching review of the record, on a case-by-case basis").

Some of the factors developed by the courts are similar to the factors that would be considered in determining whether to pierce the corporate veil of a corporation and hold shareholders liable for the corporation's debts. These include:

1. Parent corporation owns all or a majority of the stock of the subsidiary.

2. Parent and subsidiary have common officers and directors.

3. Parent finances the subsidiary.

4. Parent is responsible for incorporation of the subsidiary.

5. Subsidiary has grossly inadequate capital.

6. Parent pays salaries, expenses or losses of subsidiary.

7. Subsidiary has substantially no business except with the parent.

8. Subsidiary has essentially no assets except for those conveyed by the parent.

9. Parent refers to subsidiary as department or division of parent.

10. Directors or officers of subsidiary do not act in interests of the subsidiary, but take directions from the parent.

11. Formal legal requirements of the subsidiary as a separate and independent corporation are not observed.

*See In re Gulfco,* 593 F.2d 921 (10th Cir. 1979); *In re Tureaud,* 45 B.R. 658, 662 (Bankr.N.D.Okla.1985), *aff'd Heller v. Langenkamp (In re Tureaud),* 59 B.R. 973 (N.D.Okla.1986).

The Bankruptcy Court in *In re Vecco Constr. Indus.,* 4 B.R. 407, 410 (Bankr. E.D.Va.1980), elaborated on and reconfigured these factors somewhat, as follows:

1. The degree of difficulty in segregating and ascertaining individual assets and liabilities.

2. The presence or absence of consolidated financial statements.

3. The profitability of consolidation at a single physical location.

4. The commingling of assets and business functions.

5. The unity of interests and ownership between the various corporate entities.

6. The existence of parent and intercorporate guarantees on loans.

7. The transfer of assets without formal observance of corporate formalities.

More recent cases, while acknowledging the factors just set out, have given greater consideration to a balancing of the prejudices for and against substantive consolidation. *See, e.g., Eastgroup Properties,* 935 F.2d at 249–50; *Snider Bros.,* 18 B.R. at 234. *Snider Bros.* characterized the analysis as weighing "the economic prejudice of continued debtor separateness versus the economic prejudice of consolidation." *Id.* Courts utilizing this approach have permitted consolidation when the following factors are present:

1. There is a substantial identity of the entities to be consolidated.

2. There is either a necessity for consolidation or a harm to be prevented or a benefit to be gained by consolidation.

3. The objecting creditor did not rely on the separate credit of one or more of the entities and would thus not be prejudiced by consolidation.

4. The demonstrated benefits of consolidation counterbalance or heavily outweigh the harm to the objector.

*Id. See also, Eastgroup Properties, supra;* 2 COLLIER ON BANKRUPTCY ¶ 105.09[2][b] at 105–94 to 105–96.

The Eighth Circuit Court of Appeals has opted for what appears to be a combination of the two general approaches described above. In *First National Bank of El Dorado v. Giller (In re Giller),* 962 F.2d 796 (8th Cir.1992), the court stated, "Factors to consider when deciding whether substantive consolidation is appropriate include 1) the necessity of consolidation due to the interrelationship among the debtors; 2) whether the benefits of consolidation outweigh the harm to creditors; and 3) prejudice resulting from not consolidating the debtors." *Id.* at 799. The Eighth Circuit's use of the word "include" indicates the court's contemplation that other factors, such as those set out above, may be considered by the bankruptcy court in ordering substantive consolidation; indeed, many of the factors enumerated above are but subsets of the three general factors listed by the court in *Giller.* Furthermore, *Giller* specifically encourages a weighing of the benefits of consolidation versus the prejudice of not consolidating the debtors.[6]

Having these guidelines in mind, the Court finds that there is substantial evidence in the record before the Court to support an order consolidating these three Debtors.

### 1. Interrelationship of the Debtors.

#### a. Ownership, officers, directors, corporate business.

The Committee adduced substantial evidence to show the corporate interrelationships of Affiliated Foods and its subsidiaries. Affiliated Foods has been, for several years, the sole owner of all of the stock of Belt and Hy–Klas. At the time of the bankruptcy filing by Affiliated Foods in July 1999, the officers and directors of the three companies were the same. Kenneth G. Korell became secretary of all three companies in August 1997, although he did not become aware that he was the secretary for the two subsidiaries until July 1999 when Affiliated Foods filed bankruptcy. The boards of directors of the subsidiaries never held separate board meetings from Affiliated Foods; instead, any corporate matters involving the subsidiaries were taken up at the board meetings of

---

**6.** In *Giller,* the Court confirmed that substantive consolidation is within the bankruptcy court's equitable powers and indicated that the bankruptcy court has broad discretion in ordering substantive consolidation, stating that an abuse of discretion standard might be the appropriate standard of review. *Giller,* 962 F.2d at 799.

Affiliated Foods and appeared on the agendas as if they were the business of Affiliated Foods. Korell testified that no separate board minutes were kept for the subsidiaries, even prior to his becoming secretary in 1997. Robert Dennis Carlson became president of all three companies in June 1999. He had been treasurer of all three companies since August 1998, but was not aware for some time that he was the treasurer of the subsidiaries. Carlson corroborated Korell's testimony that the business of all three companies was conducted by the Affiliated Foods board without regard to the separate entities.

The annual corporation fees for the subsidiaries were paid by Affiliated Foods, even though the subsidiaries had the funds with which to pay the fees, because, as Carlson explained, "we always did it that way." Even after the bankruptcy filing, the annual corporate state registration fees were paid by Affiliated Foods with checks drawn on its debtor-in-possession account.

Carlson and Korell, both of whom had worked for Affiliated Foods for well over twenty years, entered into employment agreements with Affiliated Foods on June 30, 1999. Their contracts were guaranteed by Belt, so that, as Carlson explained, both men could continue working and providing services to the companies in the event Affiliated Foods filed bankruptcy. However, their salaries were paid by Affiliated Foods, not the subsidiaries.

### b. Operation of businesses.

According to Korell and Carlson, Hy–Klas was a division of Affiliated Foods that was used by Affiliated Foods to supply milk and milk by-products (e.g., ice cream and cottage cheese) to the retail store customers of Affiliated Foods. Korell and Carlson understood that this was done to comply with state licensing laws concerning the distribution of those products. However, Hy–Klas had no employees of its own and had no separate warehouse facility for the storage of its products. Its products were maintained in a refrigerated area of the Affiliated Foods warehouse in Elwood, Kansas, and were delivered by Affiliated Foods trucks and drivers to the retail stores. Hy–Klas was not charged rent for its space in the warehouse and was not charged freight for the delivery of its products. Affiliated Foods billed the customers for the milk and milk by-products and collected the invoices. However, all of the revenues were deposited in a Hy–Klas account, and although the dairy products were purchased at wholesale by Affiliated Foods, Hy–Klas did not reimburse Affiliated Foods for the cost of those goods. As a result, Hy–Klas was able to accumulate substantial sums in its bank account, and that money would be transferred to Affiliated Foods as and when needed. In the statement of financial affairs filed herein by Affiliated Foods, Affiliated Foods referred to Hy–Klas as the "dairy products division" of Affiliated Foods. A packet of materials used by Affiliated Foods to recruit new store members never made reference to Hy–Klas, but rather referred to "Our Affiliated Dairy Department. . . ."

The Belt subsidiary's primary business was producing posters, signs, screen printed products, personalized promotional materials and apparel ("retail apparel"), and similar products for Affiliated Foods' member stores and nonmember businesses.[7] This business started as a part of Affiliated Foods' printing department in 1992 with a single employee, and eventually grew to 8-10 employees. In 1995, this operation was moved to a former grocery store property in St. Joseph, Missouri, just across the Missouri River from the El-

7. According to Affiliated Foods' 1995–96 annual report, "[t]he department personalizes all types of apparel including hats, t-shirts, sweatshirts and jackets through embroidery and screen printing. It also produces signs and specialty advertising pieces such as pens, pencils, cups and calendars." Revenues from this operation in the 1994–95 fiscal year exceeded $550,000.00, according to the report.

wood, Kansas, warehouse and was given a separate identity, Robidoux Outfitters. As director of marketing for Affiliated Foods (prior to becoming secretary), Korell spent approximately 20% of his working hours managing the Robidoux Outfitters business, although his salary was paid entirely by Affiliated Foods. In its annual reports from 1995 through 1998, Affiliated Foods repeatedly referred to this segment of its business as "the screen printing department," treating it as simply another division or department of the company, not as a separate corporate entity. Robidoux Outfitters' bank checks also stated that it was a "division of Affiliated Foods." The employees of Robidoux Outfitters were actually employees of Affiliated Foods; when Robidoux Outfitters required added employees to keep up with its work, the necessary employees were simply "borrowed" from Affiliated Foods, without reimbursement to Affiliated Foods. Belt never paid Affiliated Foods rent for the space it occupied in St. Joseph, although another tenant, unrelated to Affiliated Foods, did pay rent. As Korell put it, "why would we charge ourselves rent?" Affiliated Foods paid the utility bills for Belt's St. Joseph location. The Robidoux Outfitters products were delivered to member store customers by Affiliated Foods without charge to Belt, and revenues from the sale of Robidoux Outfitters products were collected by and deposited to an Affiliated Foods account.

When the Robidoux Outfitters business was sold in May 1999, the sale was approved by a resolution of the board of directors of Affiliated Foods and was recorded in the minutes of that board. The board resolution read: "RESOLVED, that Affiliated Foods sell Robidoux Outfitters to Affiliated Foods Cooperative of Norfolk, Ne., with a May 28, 1999 closing and with general terms outlined above."

Belt had one other business assigned to it, a retail food store in Blue Rapids, Kansas. Affiliated Foods acquired the food store property at a sheriff's sale when the previous owner went out of business. The assets of the food store were transferred from Affiliated Foods to Belt by a journal entry on the corporate books. Although Affiliated Foods had a "hard and fast" credit and collection policy for its member stores, the Blue Rapids store was not required to follow that policy. Affiliated Foods funded the store's losses and did not charge interest on the funds advanced or take a security interest in the store's assets, as it did with other member stores. Employees of the Blue Rapids store were actually employees of Affiliated Foods, and the manager there was hired and fired by Affiliated Foods, not Belt.

Affiliated Foods paid the health insurance premiums for the employees it supplied to Belt to carry on the Robidoux Outfitters operations. When it appeared that Affiliated Foods might be filing bankruptcy, the two corporate entities entered into an agreement that required Belt to assume the obligations of Affiliated Foods to the Affiliated Foods employee health care fund. According to Korell, this was done because Belt "was a part of the company" and "there were funds to do so."

### c. Financial dealings among the entities.

Carlson, who worked in the Affiliated Foods accounting department for about 20 years before becoming treasurer of the three companies in 1998, testified that it would be extremely difficult, if not impossible, to separate the financial statements and affairs of the corporate entities. Moneys were transferred between the entities by journal entries as needed; no notes or other records were made of these transfers. For example, $1,325,000.00 was transferred from the account of Hy–Klas to Affiliated Foods in the six months preceding the bankruptcy filing by Affiliated Foods in July 1999. These transfers were made "because Hy–Klas had the money and Affiliated Foods needed it." Carlson looked at the books of Affiliated Foods every day and transferred money between

the entities as needed, sometimes without any bookkeeping entries.

Carlson testified that it would be "a real nightmare" to attempt to allocate to Hy–Klas the costs incurred by Hy–Klas over the years that were not reimbursed to Affiliated Foods, such as shipping costs, inventory costs, warehouse employees and the like. Likewise, it would probably not be possible to separate the revenues credited to Hy–Klas that actually belonged to Affiliated Foods. For example, when both dairy and non-dairy products were sold to non-member retail stores by Affiliated Foods, the revenues from such sales were credited entirely to Hy–Klas, although Hy–Klas had not paid Affiliated Foods the costs of the goods sold or the costs of shipping those products to the customers. Carlson testified that he doubted that records now exist that would allow accountants to make these separations.

With respect to Belt, the bankruptcy schedules reflected a debt of $163,966.59 owed to Affiliated Foods by Belt. However, Carlson testified that when Affiliated Foods filed its bankruptcy petition in July 1999, he wrote off many inter-company accounts, so the amount actually owed by Belt to Affiliated Foods could be much higher. Since the schedules were filed, Carlson has made a further review of the company records and has determined that a more accurate estimation of the amount owed by Belt to Affiliated Foods would be approximately $913,531.00. Additionally, Carlson testified that, in many instances, losses incurred by Affiliated Foods when failing stores were taken back were carried forward on the books of Belt and were not written off on the books of Affiliated Foods, as they should have been, so as not to affect the patronage refunds that might be paid to members in a given year.

As has been noted earlier, the subsidiaries guaranteed the employment contracts of Carlson and Korell and paid or guaranteed certain of the health care costs of the Affiliated Foods employees, primarily because the subsidiaries had the money to do so at a time when Affiliated Foods did not. The companies had consolidated financial statements and filed consolidated income tax returns.

The foregoing discussion demonstrates that, in practice and reality, the businesses of the three corporate entities/debtors were carried on as a single business, not only in their dealings with the public and their member stores but in their corporate and financial dealings. Revenues, expenses, employees, and operations were intermingled to such an extent that separating them now, if it could be accomplished at all, would be inordinately expensive and time-consuming, and would serve no useful purpose. These extensive interrelationships support an order of substantive consolidation in this case.

### 2. The benefits of consolidation vs. the harm to creditors.

The second factor set out by the Court in *Giller* requires the bankruptcy court to determine whether the benefits of consolidation outweigh the harm to creditors. *Giller*, 962 F.2d at 799. In this case, the Court believes that, in the final analysis, the benefits of consolidation substantially outweigh the harm to creditors.

#### a. The benefits of consolidation.

If the three Debtors' estates are consolidated, both the assets and the liabilities of all three entities would be combined, and the liabilities of the entities would then be satisfied from the common pool of assets. *Eastgroup Properties*, 935 F.2d at 248. In these cases, the assets are, in round numbers: Affiliated Foods—$4,000,000.00 (estimated, after payment of administrative and priority claims); Hy–Klas—$190,-000.00; and Belt—$138,000.00, for a total of approximately $4,328,000.00.[8]

---

8. It is quite possible that the estate of Affiliated Foods will be significantly higher than the

$4,000,000.00 used in this analysis. See the

Affiliated Foods has approximately 2,400 creditors, and the schedules filed herein indicate that the total amount of unsecured debt (excluding the claim of Central States) is approximately $4,123,000.00. However, Hy–Klas and Belt have only a single outside creditor, Central States.[9] As discussed in greater detail below, Central States has filed a proof of claim for $1,046,283.76 for the statutory withdrawal liability that has been determined pursuant to 29 U.S.C. § 1399, et seq. Central States has asserted (and it is not contested) that the three entities are jointly and severally liable for this withdrawal liability. The Court has determined, infra, that only fifty percent of the withdrawal penalty is to be treated as an unsecured debt in the Affiliated Foods case, and the remaining fifty percent must be subordinated to the general unsecured creditors, and the Court's analysis will be based on that assumption.

The most obvious benefit of consolidation would be to bring into the pool of assets all of the assets of Hy–Klas ($190,000.00) and Belt ($138,000.00), which would then be available for distribution to the general unsecured creditors. In other words, all of the unsecured creditors would share an additional $328,000.00 to be distributed to them pro rata. This added benefit would be somewhat offset, however, by the increased claim of Central States in the pool of unsecured creditors (although there would be no increase in the actual number of creditors, because Central States is a creditor in all three cases). If the cases are consolidated, Central States would have an unsecured claim in the consolidated case of $523,142.00 (50% of $1,046.284.00). However, if the entities are not consolidated, Central States would have a general unsecured claim of $359,142.00 in the Affiliated Foods case.[10] Thus, Central States' unsecured claim would be $164,000.00 higher in the consolidated case than if the cases are not consolidated.

A second, yet major, benefit to consolidation of the cases will be the substantial savings to be realized as a result of the elimination of the inter-company claims and liabilities. As already noted, it is estimated that Belt would owe Affiliated Foods at least $913,531.00 if all accounts were balanced, and no attempt has yet been made to attempt to determine how much might be owed by Hy–Klas. If consolidation is not ordered, the Committee has indicated that it would intend to pursue the inter-company accounts to recover as much money as possible for the benefit of the unsecured creditors in the Affiliated Foods case. Based on the testimony presented at the confirmation hearing, the Court believes that the legal, accounting and other fees that might be incurred in the pursuit of these inter-company claims would be substantial, which would in turn reduce the amount of money available for distribution to the unsecured creditors.

An ancillary benefit to be realized from the elimination of the inter-company claims will be the more prompt and efficient administration of the consolidated bankruptcy estate. The Committee will be able to focus on the recovery of preferential and fraudulent transfer claims and conclude the administration of the estate much more quickly than if the inter-company claims must be pursued. Therefore,

discussion, infra, concerning the best interests of creditors analysis.

9. According to Carlson's testimony, it is probable that Belt owes Affiliated Foods approximately $913,531.00, and it is also likely that Hy–Klas would owe Affiliated Foods a large amount if all inter-company accounts were analyzed and settled. However, if substantive consolidation is ordered, all inter-company claims and liabilities are eliminated.

10. The sum of $359,142.00 is arrived at in this way: If the $328,000.00 received from the subsidiaries' estates is applied to Central States' total $1,046,283.76 claim first, the claim would be reduced to $718,284.00, and further reducing that amount by 50% as authorized by 29 U.S.C. § 1405, would result in an unsecured claim of $359,142.00.

it is likely that all creditors will be paid their pro rata distributions much sooner in a consolidated case.

### b. Harm to creditors.

As the foregoing discussion makes obvious, the only creditor that might be harmed by consolidation of the cases would be Central States. The Court's analysis of the evidence, including the inferences and assumptions to be drawn therefrom, indicates that Central States might receive $171,920.00 less from a consolidated estate than from the separate estates, if the total amount of funds to be distributed in the consolidated estate is $4,000,000.00.[11] However, as indicated in the Court's best interests of creditors analysis, *infra,* the Court believes that the amount that will be available for distribution will be substantially in excess of $4,000,000.00, thereby reducing the detrimental effect of consolidation to Central States.

The apparent detriment to Central States merits further examination, however. There is a certain unfairness or inequity in the position taken by Central States that troubles the Court.

First, the Court is bothered by the obvious unfairness of allowing Central States to receive all of the assets of the two subsidiaries, Hy–Klas and Belt, rather than having those assets distributed to all of the creditors of all three entities. As we have noted in the extended discussion hereinabove, the three entities were, for all practical purposes, operated as a single enterprise. Affiliated Foods provided various services (such as shipping products to customers, refrigerating dairy products, paying utilities, etc.) for which the subsidiaries were never billed and for which the subsidiaries never paid. Large sums of money were transferred back and forth between the entities, with nothing more than a bookkeeping entry and no further accountability. The subsidiaries borrowed employees from Affiliated Foods but never reimbursed Affiliated Foods for them. Belt never paid rent for the Affiliated Foods building it occupied. As the officers of Affiliated Foods testified, it would be virtually impossible to separate the assets and liabilities of the entities. If the businesses were not conducted separately, which we have found to be the situation, then fairness dictates that the assets *and* the liabilities should be pooled and Central States should be treated the same as any other general unsecured creditor of the group.

Secondly, even if we assume that the subsidiaries had their own separate employees (which does not appear to have been the case), Affiliated Foods employed ninety to ninety-five percent of the employees for whom the withdrawal liability is being asserted by Central States. The subsidiaries had few or no employees. While Central States rightly claims that the Multiemployer Pension Plan Amend-

---

11. This amount, $171,920.00, is arrived at through the following analysis. First, if the cases are not consolidated, Central States presumably would receive $190,000.00 from the Hy–Klas bankruptcy estate and $138,000.00 from the Belt bankruptcy estate, a total of $328,000.00. Deducting this amount from the Central States withdrawal liability claim of $1,046,284.00 would leave a deficiency balance of $718,284.00. Only 50% of that amount, or $359,142.00, would be allowed (see discussion, *infra*) as a general unsecured claim in the Affiliated Foods bankruptcy estate. Central States' pro rata share of the distributions in that estate would be 8%, assuming total unsecured claims of $4,482,142.00 ($4,123,000.00 as listed in the bank-

ruptcy schedules, plus the Central States claim of $359,142.00). Assuming distributions of $4,000,000.00, Central States would receive an additional $320,000.00, bringing the total it would receive from the three nonconsolidated estates to $648,000.00.

Second, if the cases are consolidated, Central States would have a general unsecured claim of $523,142.00 (50% of $1,046,284.00). This would increase the total amount of claims in the consolidated cases to $4,646,142.00, and Central States' pro rata share would be 11%. Again assuming distribution of $4,328,000.00, Central States would receive a total of $476,080.00, which is $171,920.00 less than it would receive if the cases are not consolidated.

ments Act, at 29 U.S.C. § 1301, imposes joint and several liability for the withdrawal penalty on employers that are under "common control," this does not necessarily mean that Central States should be entitled to claim *all* of the assets of the controlled companies at the expense of all other creditors of the controlled group, particularly in a bankruptcy context. There is something inherently inequitable in Central States' position that the liability of the three entities for the withdrawal penalty should be joint and several, but the assets available to satisfy that liability should remain separate.

Thirdly, there has been no showing by Central States that it had any relationship with the subsidiaries or even knew of the existence of the subsidiaries prior to the filing of these bankruptcy proceedings. Central States is a creditor of the subsidiaries only by virtue of statute, and then only for a statutory penalty. Central States has not demonstrated that it relied on the credit of either of the subsidiaries in the funding or administration of the pension plan, *see Eastgroup Properties,* 935 F.2d at 249, yet it wants to claim all of the assets of the subsidiaries to satisfy the withdrawal liability that has been incurred substantially—if not exclusively—on the part of the Affiliated Foods employees. Central States has argued that consolidating these cases would result in a windfall to the general unsecured creditors of Affiliated Foods. On the contrary, not consolidating the cases would result in a $171.920.00 windfall to Central States.[12] If there is, indeed, a windfall to be received, the equities favor the 2,400 general unsecured creditors.

Finally, it would be inequitable to permit Central States to lay claim to all of the assets of the subsidiaries in partial satisfaction of what amounts to a statutory penalty, and deprive the other creditors of the group of payment of the amounts they are owed for having provided actual goods and services to the debtors. Those other creditors, including numerous ex-employees of Affiliated Foods, have expended their own time and money in providing services to the debtors, whereas Central States seeks only to collect a penalty that has now been robbed of its statutory purpose by these bankruptcy proceedings. The withdrawal liability is imposed by the Multiemployer Pension Plan Amendments Act of 1980 as a "disincentive," as the Committee's expert witness called it, to prevent or dissuade employers from voluntarily withdrawing from a multiemployer pension plan. However, in the present instance, with Affiliated Foods and the subsidiaries all having ceased their business operations and now being involved in liquidating bankruptcy proceedings, imposing the withdrawal penalty will not serve any disincentive purpose. All members of the Affiliated Foods controlled group will cease to exist; they are not withdrawing from the Central States pension plan simply because they no longer want to be a part of it or want to claim the surplus. In these circumstances, there is no equitable reason to require the other general unsecured creditors of the three entities to suffer at the expense of the Central States pension plan.

For the foregoing reasons, this Court finds that the benefits of consolidation of these three cases outweigh any harm that might be suffered by the objecting creditor, Central States.

### c. Prejudice resulting from not consolidating the debtors.

All that has been said in the preceding discussion is applicable in some degree to the determination of whether there would be prejudice if these cases are not consolidated. The obvious prejudice of not consolidating the cases would be suffered by the body of general unsecured creditors, who would not be allowed to receive their pro rata share of the $328,000.00 in cash assets held by Hy–Klas and Belt. Be-

---

**12.** *See supra* note 10.

sides, it is quite possible that the subsidiaries owe more to Affiliated Foods than they have assets with which to pay, in which case the cash assets of the subsidiaries would end up in the Affiliated Foods bankruptcy estate in any event.[13] For example, Carlson, the president of Affiliated Foods, testified that he believed Hy–Klas would owe Affiliated Foods at least $913,531.00 if all accounts were analyzed and balanced, yet Hy–Klas has only $190,000.00 in assets. Additionally, these same creditors would be prejudiced by the delays in case administration and closing that would occur if the cases are not consolidated, due to the time that would be required to litigate the inter-company claims and liabilities. Finally, the litigation of those inter-company claims would increase the expenses of administration to the detriment of all the general unsecured creditors, including Central States.

In summary, the Court finds that, under all the circumstances in these cases, the analysis favors a consolidation of these three bankruptcy estates. The three entities have been so intertwined in their business and corporate relationships as to be practically inseparable and indistinguishable. Consolidation will substantially benefit the nearly 2,400 creditors of Affiliated Foods by making additional assets available for distribution to all creditors, possibly at the expense of Central States, whereas non-consolidation would inure to the benefit of just one creditor, Central States. The creditors would be prejudiced by non-consolidation in that they would be prevented from sharing in the assets of the subsidiaries and the administration of the Affiliated Foods bankruptcy estate would be extended and greater expenses incurred as the inter-company claims and liabilities are litigated. For all of these reasons, the Court will order the consolidation of the three bankruptcy estates and cases.

## II. Subordination of 50% of the Central States Unsecured Claim

■ Under its Plan, the Committee proposes to treat fifty percent of Central States' withdrawal liability claim ("Claim") as a general unsecured claim (Class 4) and to subordinate the other fifty percent to the claims of the general unsecured creditors (Class 6). The Committee cites 29 U.S.C. § 1405(b)[14] as the basis for separately classifying and subordinating fifty percent of Central States' Claim. Central States objects to this treatment of its Claim. Specifically, it argues that the Committee should not be allowed to invoke the subordination provision of § 1405. Central States bases its argument, not on a dispute as to whether the statute, by its terms, can be applied to the Claim, but rather on the assertion that the Committee waived its right to assert § 1405(b) by failing to timely initiate arbitration pursuant to 29 U.S.C. § 1401, and that a failure to comply with § 1401 results in a forfeiture of all rights to contest the assessment of withdrawal liability. The Court believes that Central States misinterprets and misapplies § 1401.

29 U.S.C. § 1401 provides, in pertinent part:

(1) Any dispute between an employer and the plan sponsor of a multiemployer plan concerning a determination made under sections 1381 through 1399 of this title shall be resolved through arbitration. Either party may initiate the arbitration proceeding within a 60-day period after the earlier of—

(A) the date of notification to the employer under section 1399(b)(2)(B) of this title, or

---

13. Furthermore, if it were, in fact, determined that Affiliated Foods was an unsecured creditor of the subsidiaries, 50% of Central States' claim against Hy–Klas and Belt might also be subordinated pursuant to 29 U.S.C. § 1405. See discussion, *infra*.

14. *See infra* text accompanying note 15 for text of statute.

(B) 120 days after the date of the employer's request under section 1399(b)(2)(A) of this title.

29 U.S.C. § 1401(a)(1).[15]

According to Central States, Affiliated Foods and, derivatively, the Committee lost the right to contest the assessment of withdrawal liability when they failed to request a review of the assessment or file a notice of initiation of arbitration by January 21, 2000 (90 days after the latest notice and demand of withdrawal liability). This much of the argument finds no objection from the Committee or the Court; the Committee readily admits, and the Court agrees, that the Committee cannot (nor does it try to) dispute the amount of Central States' Claim.

Central States further argues, however, that the Committee's attempt to invoke the subordination provision of § 1405 amounts to a "dispute" over the "amount" of Central States' Claim, and as such, needed to be asserted and submitted for arbitration prior to January 21, 2000, in order to be timely and effective. We disagree. Rather, the Court believes that Central States' use of the term "amount" and characterization of § 1405's application as a "dispute" are without support in the statute or in logic.

■■ Section 1405 provides, in pertinent part:

(b) **Unfunded vested benefits allocable to insolvent employer undergoing liquidation or dissolution; maximum amount; determinative factors**

In the case of an insolvent employer undergoing liquidation or dissolution, the unfunded vested benefits allocable to that employer shall not exceed *an amount equal to the sum of—*

(1) 50 percent of the unfunded vested benefits allocable to the employer (*determined without regard to this section*), and

(2) that portion of 50 percent of the unfunded vested benefits allocable to the employer (as determined under paragraph (1)) which does not exceed the liquidation or dissolution value of the employer determined—

(A) as of the commencement of liquidation or dissolution, and

(B) after reducing the liquidation or dissolution value of the employer by the amount determined under paragraph (1).

29 U.S.C. § 1405(b), ERISA § 4225(b) (emphasis added).[16] Section 1405 is generally accepted to mean that "in liquidation proceedings under the Bankruptcy Code, the multi-employer plan will have the status of a creditor with respect to the first 50% of its withdrawal liability claim; after all creditor claims have been satisfied in full, the remaining 50% of withdrawal liability claim will be satisfied ahead of equity security holders." *Cott Corp. v. New England Teamsters & Trucking Indus. Pension Fund (In re Cott Corp.)*, 26 B.R. 332, 335 (Bankr.D.Conn.1982) (citing Richard S. Soble, *Bankruptcy Claims of Multiemployer Pension Plans*, 33 Lab.L.J. 57, 60 (1982)). In other words, the "amount" of

---

**15.** The parties also disagree on the issue of whether disputes about the application of § 1405 are subject to § 1401's arbitration requirement at all—Central States argues that even though § 1401 doesn't apply to § 1405 on its face, case law interpreting § 1401 in this context indicates that § 1401 does apply to § 1405 disputes. *See Central States, S.E. and S.W. Areas Pension Fund v. Skyland Leasing Co.*, 691 F.Supp. 6, 14–15 (W.D.Mich. 1987), *aff'd mem.*, 892 F.2d 1043 (6th Cir. 1990); *Central States, S.E. and S.W. Areas Pension Fund v. Johnco, Inc.*, 694 F.Supp. 478, 480–81 (N.D.Ill.1988); *Trustees of Amalgamated Cotton Garment & Allied Industries*

*Fund v. Baltimore Sportswear,* Inc., 632 F.Supp. 641, 642 (S.D.N.Y.1986). The Committee counters that even if § 1401 did apply, the Committee is excepted from the arbitration requirement pursuant to the Eighth Circuit's holding in *Rheem Mfg. Co. v. Central States, S.E. and S.W. Areas Pension Fund,* 63 F.3d 703 (8th Cir.1995). Because we find that Central States has not identified any § 1405 dispute to which § 1401 can apply, we need not address this issue.

**16.** *See Johnco, Inc.,* 694 F.Supp. at 481.

the withdrawal liability is not affected by § 1405, only the manner in which the claim is to be treated in bankruptcy.[17] This interpretation is supported by the plain language of the statute. Section 1405 specifically states that the amount of the unfunded vested benefits allocable to that employer (i.e., the withdrawal liability), is to be "determined without regard to this section." 29 U.S.C. § 1405(b)(1). A contrary interpretation would be at odds with the plain language of the statute and illogical, inasmuch as it would be impossible to take fifty percent of an amount that had yet to be determined. *United States v. Ron Pair Enter., Inc.*, 489 U.S. 235, 241, 109 S.Ct. 1026, 1030, 103 L.Ed.2d 290 (1989) ("Where ... the statute's language is plain, the sole function of the courts is to enforce it according to its terms.").

Moreover, under the terms of the statute, it is entirely possible for the full "amount" of a withdrawal liability claim to be paid, thus illustrating the independence of the amount of the withdrawal liability and the mechanical application of § 1405. For example, if a liquidating Chapter 11 debtor (employer) prevailed in a suit against someone with whom they had prior business dealings and recovered a judgment large enough to pay the unsecured creditors *and* any subordinated creditors, in full, the *amount* of the withdrawal liability would be satisfied, unaffected by § 1405. Likewise, if Affiliated Foods succeeds in its cause of action against Affiliated Foods Cooperative, Inc., of Norfolk, Nebraska, which has been estimated to be worth as much as $10 million, the full amount of Central States' withdrawal liability claim will be paid.

■ Central States' characterization of the Committee's assertion of § 1405 as a "dispute" is also erroneous. First of all, it is difficult for the Court to understand how the exercise of a statutory right constitutes a dispute. The purpose of § 1405 is to "limit the impact of withdrawal liability on other general creditors of insolvent employers." Steven J. Sacher, et al., *Employee Benefits Law*, 1991 A.B.A. Sec. of Labor & Employment Law, Employee Benefits Committee at 801. It is not a vehicle to contest withdrawal liability, alter withdrawal liability, or evade withdrawal liability. It simply provides a right that may be exercised by insolvent employers. To characterize the exercise of this right as a "dispute" is contrary to the terms of the statute and evades logic.

Second, Central States has repeatedly asserted that § 1401 requires "any" dispute to be timely submitted to arbitration or it will be conceded. But, it has not once, in its pleadings or at trial, given *any* indication exactly what is being disputed. It has not alleged that Affiliated Foods was not eligible to assert § 1405. It has not alleged that the Committee was not eligible to assert § 1405 (assuming it had done so timely), nor has Central States alleged that the Committee is improperly applying § 1405. The only dispute to be arbitrated pursuant to § 1401 that the Court can ascertain is, as the Committee points out it its Response, whether arbitration is required, and that dispute is clearly not one anticipated by the statute.

Therefore, for the reasons stated above, the Court finds that, pursuant to 29 U.S.C. § 1405 the Committee's Plan's proposal to treat fifty percent of Central States' withdrawal liability claim as a general unsecured claim (Class 4) and to subordinate the other fifty percent to the claims of the general unsecured creditors (Class 6) is

---

**17.** *Cf. Trustees of Amalgamated Cotton Garment and Allied Industries Fund v. Baltimore Sportswear, Inc.*, 632 F.Supp. 641, 642 (S.D.N.Y.1986) (mentioning, in dicta, that a consideration of § 1405 is necessary to determine "total liability"); *Central States, Southeast and Southwest Areas Pension Fund v. Skyland Leasing Co.*, 691 F.Supp. 6, 15 (W.D.Mich.1987) (stating that "the *availability,* via Sections 1405(b) and (d), of a decrease in the amount of liability assessed is a factual dispute integrally related to the total amount of liability ...") (emphasis added).

proper and will overrule Central States' objection thereto accordingly.

## III. 11 U.S.C. § 1129(a)(7)(ii)—Best Interest of Creditors Test

■ Central States also objects to the Plan on the basis that it fails to meet the requirements of § 1129(a)(7)(ii), otherwise known as the "best interests of creditors test." Under the best interests of creditors test, a Chapter 11 plan can be confirmed over the objection of a holder of a claim or interest that is impaired by the plan only if the holder of the impaired claim or interest "will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date." 11 U.S.C. § 1129(a)(7)(ii). It is undisputed that Central States is the holder of an impaired claim and has standing to object to the Plan. *In re New Midland Plaza Assoc.*, 247 B.R. 877, 895 (Bankr. S.D.Fla.2000).

■ Applying the best interests of creditors test requires the Court to "conjure up a hypothetical chapter 7 liquidation that would be conducted on the effective date of the plan." *In re Sierra–Cal*, 210 B.R. 168, 172 (Bankr.E.D.Cal.1997). The Court then makes an independent finding, based on the evidence and arguments presented, whether creditors will receive as much under the plan as they would in the hypothetical Chapter 7 liquidation. The plan proponent bears the burden of proof to establish by a preponderance of the evidence that its plan meets the best interests test. *In re Briscoe Enters., Ltd. II*, 994 F.2d 1160, 1167 (5th Cir.1993).

Central States' objection to the plan arises primarily from the fact that the tax liability on the Debtor's primary asset, approximately $1,000,000.00 in an over-funded pension plan, will be higher under the Committee's Chapter 11 Plan than in a Chapter 7 liquidation, thus resulting in a lower net distribution in Chapter 11. More specifically, Central States contends that in a Chapter 7, the surplus in the pension plan would be subject to a 20% tax[18] whereas under the Plan it would be subject to a total reduction of 36% (first, participant benefits would be increased by 20% of the surplus, and then the remainder would be taxed at the 20% rate, resulting in a net diminution of 36%).[19] Assuming the maximum trustee's fees are awarded pursuant to 11 U.S.C. § 326(a) on a $4,000,000.00 estate, the net distribution under the Plan would be $16,750.00 less than it would be in a hypothetical Chapter 7. In concrete figures:

| CHAPTER 7 | | CHAPTER 11 PLAN | |
|---|---|---|---|
| Surplus | $1,000,000.00 | Surplus | $1,000,000.00 |
| 20% Tax | ($200,000.00) | 20% Increase in Benefits | ($200,000) |

18. Upon the termination of a qualified pension plan, any amount of employer reversion is taxed at a rate of 20% pursuant to 26 U.S.C. § 4980(a). Section 4980(d) provides for an increase in the rate to 50%, but employers liquidating under Chapter 7, as Affiliated Foods would be in the hypothetical liquidation, are excepted from this increase.

19. In its Objection, Central States originally argued that the surplus would be taxed at an increased rate of 50% pursuant to § 4980(d), because employers liquidating under Chapter 11 are not entitled to the lower 20% rate available to Chapter 7 debtors, and an exception that allows employers who increase participant benefits by 20% to be taxed at 20% is also not available to Affiliated Foods. At the confirmation hearing, however, Central States conceded that Affiliated would qualify for the exception for employers who increase participant benefits by 20%.

| | | | |
|---|---|---|---|
| Trustee's Fees on $4 million estate.[20] | ($143,250.00) | 20% Tax (on reduced surplus, after 20% increase in benefits) | ($160,000) |
| **TOTAL** | **$656,750.00** | **TOTAL** | **$640,000.00** |

■ Using these figures, the Plan does indeed appear to fail the best interests test by $16,750.00. Considering the size of the estate and the projected surplus, this figure does not seem significant. But, as counsel for Central States accurately pointed out at the hearing, § 1129(a)(7)(ii) is a bright line test and does not appear to provide for any *de minimis* exception. The Court does not disagree with Central States' interpretation of the statute; we do, however, disagree with the assumptions on which these figures are based. The Committee contends, and we agree, that the trustee's fees will most likely be higher than the $143,000.00 figure Central States uses in its calculations, and once the fees rise by $16,750.00, to $159,750.00, the Plan will pass the best interests of creditors test. Because Chapter 7 trustee's fees are determined by the size of the estate according to the formula set forth in 11 U.S.C. § 326(a),[21] the outcome of the best interests of creditors test rests on the estimated value of the hypothetical chapter 7 bankruptcy estate, and any valuation of the hypothetical chapter 7 bankruptcy estate that exceeds $4,561,666.00 will result in the requisite increase in trustee's fees.

■ The valuation of a hypothetical Chapter 7 for purposes of § 1129(a)(7)(ii) is not an exact science. "The hypothetical liquidation entails a considerable degree of speculation about a situation that will not occur unless the case is actually converted to chapter 7." *In re Sierra–Cal,* 210 B.R. at 172. It requires an estimation of the value of all of the bankruptcy estate's assets, including such hard to determine values as disputed and contingent claims, *id.,* the potential disallowance of claims (under § 502(d)), *id.,* the probability of success and value of causes of action held by the estate, *In re Texas Extrusion Corp.,* 844 F.2d 1142, 1158 (5th Cir.1988), and, in this case, potential preference actions.[22] Additionally, some courts have considered more intangible sources of value such as the increased likelihood of a creditor recovering money through a structured settlement in a Chapter 11 versus a difficult collection process in a Chapter 7. *See Keck, Mahin & Cate,* 241 B.R. 583, 590–91 (N.D.Ill. 1999).

■ On the other hand, although the valuation of a hypothetical Chapter 7 is, by nature, inherently speculative, it must be based on evidence. *In re Voluntary Pur-*

20. Both Central States and the Committee state that the trustee's fees for a $4,000,-000.00 estate will be $143,000.00. However, using the formula set forth in § 326(a), the actual figure is $143,250.00. For the sake of accuracy, we will use the higher figure.

Furthermore, the Court notes that although trustees often reduce their fees in bankruptcies with large estates, such a discount is unpredictable, and therefore the Court will use the statutory fees in its calculations.

21. 11 U.S.C. § 326(a) provides:

In a case under chapter 7 or 11, the court may allow reasonable compensation under section 330 of this title of the trustee for the trustee's services, payable after the trustee renders such services, not to exceed 25 percent on the first $5,000 or less, 10 percent on any amount in excess of $5,000 but not

in excess of $50,000, 5 percent on any amount in excess of $50,000 but not in excess of $1,000,000, and reasonable compensation not to exceed 3 percent of such moneys in excess of $1,000,000, upon all moneys disbursed or turned over in the case by the trustee to parties in interest, excluding the debtor, but including holders of secured claims.

22. The Court has not discovered any cases in which the value of potential preference actions was taken into consideration in a hypothetical liquidation analysis, perhaps because in most cases, the value of such actions would be attributed to both sides of the best interests of creditors equation. In this case, however, because we are concerned with overall value of the estate, the Court believes it is proper to include the value of potential preference actions in its calculations.

*chasing Groups,* 222 B.R. 105, 108 (Bankr. E.D.Tex.1998). The evidence in this case suggests that the value of the bankruptcy estate will be higher than the $4,000,000.00 estimate relied on by Central States in its calculations for the best interests test.

The $4,000,000.00 value Central States assigns to the estate is too low because it excludes a number of important sources of value. First and foremost, the Court believes that the hypothetical Chapter 7 liquidation analysis should be based on the value of the consolidated estate, which equals $4,328,000.00 (Hy–Klas—$190,-000.00 and Belt—$138,000.00), rather than Central States' valuation of the estate at $4,000,000.00, which appears to be based on the liquidation value of Affiliated Foods alone. Neither Hy–Klas nor Belt has proposed its own Chapter 11 plan, and the Court safely assumes that in the event the Plan would not be confirmed, their cases would promptly convert to Chapter 7. Moreover, by considering the value of the liquidated estates together, the Court is actually choosing the option that results in a far less increase in trustee's fees; inclusion of Hy–Klas' and Belt's assets in the consolidated estate increases the trustee's fees by $9,840.00 (3% of $328,000.00), whereas considered separately, the trustee's fees increase by $22,900.00.[23] That difference alone closes the $16,750.00 gap considerably.

The next largest source of value ignored by Central States is the potential recovery of preferences from creditors and insiders. According to Affiliated Foods' Statement of Financial Affairs (Exhs. B and C), $8,194,299.48 in payments were made by Affiliated to outside creditors in the ninety days prior to filing bankruptcy, and $689,-640.04 in payments were made to insiders

within a year of the filing. Although many of these payments may turn out not to be preferences or to be uncollectible, even a five percent recovery will result in a net increase to the estate of over $400,000.00, which translates into another $12,000 in trustee's fees.[24]

Another source of value to the estate, which may provide an even more direct and immediate benefit to the creditors (rather than an indirect benefit achieved by virtue of higher trustee's fees, which are only a small percentage of the actual increase to the estate), is the savings that will likely be achieved by employing the same attorneys for the responsible party as are now representing the proponent of the Plan. It is the Court's understanding, based on representations made by counsel for the Committee in open court, that after confirmation of the Plan they will represent the responsible party and aggressively pursue preference actions and any causes of action the Debtors may have against the principals of Affiliated, against Affiliated Foods Cooperative, Inc., of Norfolk, Nebraska (which, if successful, could result in a recovery of as much as $10 million), or against other parties not yet named. The monetary value of counsel for Committee's familiarity with the case should not be underestimated; the Court would not be surprised if the conversion to a Chapter 7 and the resulting time and expense necessary to bring a trustee and counsel for the trustee "up to speed" would exceed the alleged $16,750.00 advantage of conversion to Chapter 7.

Finally, there is another "hidden" expense that should not be overlooked—the time value of the money to be distributed. In all likelihood, a conversion to Chapter 7 will result in a significant delay in distri-

---

**23.** Pursuant to § 326(a) the fees would be calculated as follows: Hy–Klas, with $190,-000.00 in assets would be subject to $12,-750.00 in fees (25% of the first $5,000.00 plus 10% of the next $45,000.00 plus 5% of the remaining $140,000.00); Belt, with $138,-000.00 in assets would be subject to $10,-150.00 in fees (25% of the first $5,000.00 plus

10% of the next $45,000.00 plus 5% of the remaining $88,000.00).

**24.** This recovery is based on the assumption that the Responsible Party will promptly pursue the recovery of preferential payments upon the confirmation of the Plan.

bution; trustees usually do not make a distribution until all of the assets of the estate are collected, whereas under the Plan, the Responsible Party will make periodic distributions. In concrete terms, using Central States' estimate of a $4,000,000.00 estate, the time value of the money is approximately $670.00 a day (calculated at 6.122%—the yield on a 10-year treasury bond), which means that if distributions to creditors through the Plan are made as little as 25 days earlier than in a Chapter 7 liquidation, the Plan will satisfy the best interests of creditors test. Even assuming the initial distribution is limited to the surplus in the pension plan (approximately $1,000,000.00), the Plan will be in the best interests of creditors if the distribution is made 100 days sooner than a distribution in chapter 7 would be.

For the foregoing reasons, the Court finds that a preponderance of the evidence shows that the creditors will receive or retain under the plan property of a value that is not less than the amount that they would receive or retain if the debtor were liquidated under Chapter 7. Therefore, the Plan can be confirmed over the objection of Central States.[25]

For the reasons stated herein, it is

**ORDERED** that the Objection to Disclosure Statement and Plan of Confirmation filed by Creditor Central States on May 16, 2000, be and is hereby OVERRULED. Accordingly,

**FURTHER ORDERED** that the cases of Affiliated Foods, Inc., Case No. 99–50505, Belt AF Super, Inc., Case No. 99–50966, and Hy–Klas Food Products, Inc. Case No. 50967 be and are hereby substantively consolidated. It is

**FURTHER ORDERED** that fifty percent of Central States' withdrawal liability claim be and is hereby allowed as a general unsecured claim and fifty percent be and is hereby subordinated as provided in

the Committee's Second Amended Plan of Liquidation. It is

**FURTHER ORDERED** that the Committee's Second Amended Plan of Liquidation meets the best interests of creditors test of 11 U.S.C. § 1129(a)(7)(ii) and can be confirmed. The Committee is hereby directed to submit an Order of Confirmation for the Court's consideration.

**SO ORDERED.**

---

**25.** The Court notes, without further discussion, that, although Central States objected to confirmation of the Committee's Plan, it did

not timely submit its ballots rejecting the Plan.